Gasdjonc
                    Speakerphone Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ROBERT JONES,

4                   Plaintiff,                New York, N.Y.

5             v.                              14 Civ. 6402(KPF)

6   JAMES MEEHAN, et al.,

7                   Defendants.

8   ------------------------------x

9                                             October 28, 2016
                                              12:15 p.m.
10
    Before:
11
                    HON. KATHERINE POLK FAILLA,
12
                                              District Judge
13
                    APPEARANCES (via speakerphone)
14
    ROBERT JONES
15        Plaintiff *pro se*

16  NEW YORK CITY LAW DEPARTMENT
          Attorneys for Defendants
17  BY:  MARIA FERNANDA DECASTRO

18

19

20

21

22

23

24

25

Gasdjonc
                    Speakerphone Conference

1              (In chambers; speakerphone call connected)

2              THE COURT:  All right.  Good afternoon.  This is Judge

3     Failla.  This is the case of Jones v. Meehan, originally filed

4     as Jones v. Bloomberg.

5              Mr. Jones, do I have you on the line, sir?

6              MR. JONES:  Yes, I am, your Honor.

7              THE COURT:  OK.  Great.  Thank you.

8              Ms. Decastro, do I also have you on the line?

9              MS. DECASTRO:  Yes, your Honor.  Good afternoon.

10             THE COURT:  Good afternoon.  And thank both for

11    participating.

12             Ms. Decastro, because I will otherwise forget, can I

13    ask you, please, to be obtain a transcript of this conference

14    at its conclusion in the ordinary course?

15             MS. DECASTRO:  Yes, your Honor.

16             THE COURT:  Thank you so much.

17             All right.  So what I understand is the following.

18    There were -- as a result of a prior telephone conference that

19    we had had, Mr. Jones had asked for leave to file some

20    interrogatories.  He had some questions he wanted answered in

21    light of the discovery he had received.  He thereafter

22    submitted a number of interrogatories, and I have received both

23    those interrogatories and the defendants' objections to them.

24    What I would like to do is to go through each of these with

25    you.  Some of these I will need to ask each of you some

Gasdjonc

1    questions about.  Some of them I might not need to ask you

2    questions about.  So, let me please begin.

3              First of all, Ms. Decastro, do you have a copy of your

4    interrogatory responses?

5              MS. DECASTRO:  The objections, yes.  Yes.

6              THE COURT:  Yes.  Responses and objections, I consider

7    them to be both.

8              MS. DECASTRO:  Yes.

9              THE COURT:  OK.  And, Mr. Jones, do you have a copy of

10   your interrogatories, sir?

11             MR. JONES:  Yes, I do, your Honor.

12             THE COURT:  Do you also, sir, have a copy of Ms.

13   Decastro's objections and responses to them?

14             MR. JONES:  I also have a copy of those, yes.

15             THE COURT:  Great.  So when I'm speaking about an

16   interrogatory, if I just use the number, you will know what I

17   am talking about.

18             Beginning with the first of these, I'm understanding

19   the inquiry to be whether those individuals were in fact NYPD

20   police officers during the period January 25th through

21   January 27th of 2012.

22             Ms. Decastro, is that how you understood the question?

23             MS. DECASTRO:  I didn't really understand the

24   question, but if that's the case, then, yes.  If that's the

25   question, then we are fine with answering that.

Gasdjonc
Speakerphone Conference

1    THE COURT:  OK.  Mr. Jones, in your interrogatory 1,

2 were you trying to confirm that these individuals using these

3 tax ID or shield numbers were employed as NYPD personnel, be it

4 officers or detectives, on the dates in your interrogatory?

5    MR. JONES:  That was the objective, yes, your Honor.

6    THE COURT:  Then that is an objective you will have.

7    And, Ms. Decastro, the answer is "yes," is that

8 correct?

9    MS. DECASTRO:  That these individuals were -- yes.

10 Yes.

11    THE COURT:  OK.  Then the answer is "yes."  OK.

12    For the issue or for interrogatory number 2, Ms.

13 Decastro, I am going to ask you just to provide the amount of

14 time they were employed by the NYPD as of January 27th of 2012.

15 I don't want their employee stature or job description.  I just

16 want you to find out, please, how long they had been with the

17 department as of the date of the incidents in this case.

18    MS. DECASTRO:  Sure.  Of course, your Honor.

19    THE COURT:  OK.  With respect to interrogatory 3 and

20 interrogatory 4, which request commercial bonds or contracts, I

21 don't think such things exist, and I am not going to order

22 their production because they are irrelevant to the issues in

23 my case.

24    With respect to interrogatory 5, this is just asking

25 whether there is a contract between the Police Department and

Gasdjonc
Speakerphone Conference

1  the citizens of the City of New York to serve and protect.

2  This relates somewhat to interrogatory number 6.

3  　　　　Ms. Decastro, when police officers become police

4  officers, is there an oath that they swear?

5  　　　　MS. DECASTRO:  I believe that there is, your Honor,

6  but I don't know if it is something written down but I believe

7  that there is.

8  　　　　THE COURT:  All right.  I suspect that you can find

9  the oath, and if there is a common one that is given or if you

10  want to note that this is a typical oath that is given, if you

11  could just please have that memorialized in writing and

12  produced to Mr. Jones, all right?

13  　　　　MS. DECASTRO:  Your Honor, just to get a little bit of

14  clearness on this issue?

15  　　　　THE COURT:  Of course.

16  　　　　MS. DECASTRO:  Do you want me to have the oath that is

17  given -- because I am not sure if it is given every year.

18  　　　　THE COURT:  I understand that completely.  If you can

19  find -- I mean, for example, the oath that I take as a judge is

20  the same oath that everybody else takes as a judge.  The oath

21  that I took as a prosecutor is the same oath that people have

22  been taking for decades before me.  It is my suspicion that the

23  oath administered to NYPD officers has not changed markedly or

24  substantively since these folks were first employed.

25  　　　　On that assumption, I'm asking you to produce -- if

Speakerphone Conference

1   you can find -- the most recent oath you can find, what you can

2   find now.

3           MS. DECASTRO:  OK.

4           THE COURT:  All right.  And that also covers 6.

5           With respect to 7 --

6           Let me just look at this again.

7           (Pause)

8           -- Mr. Jones, are you asking in interrogatory 7 about

9   whether the city would be liable for the conduct of these

10  officers?

11          MR. JONES:  Yes.  That's primarily the question, your

12  Honor.

13          THE COURT:  All right.  I mean, here's the thing.

14  When it comes to issues of law, it's my preference that you not

15  get your legal instruction from your adversary.  So I

16  understand, sir, that you will be eventually making an argument

17  to me that the city should be liable for what these folks did,

18  and I think it's fair to say that there are circumstances under

19  which they might be, but I don't think it is appropriate to

20  have them tell you if they are.  So I would not -- I am going

21  to leave the law for later, for you to argue to me and me to

22  decide for you.  All right, Mr. Jones?

23          MR. JONES:  OK.  I understand, Judge.

24          THE COURT:  Thank you, sir.

25          With respect to interrogatory number 8, which goes to

Gasdjonc
                    Speakerphone Conference

1   CCRB matters, I have a recollection, Ms. Decastro, that there

2   was a certain -- perhaps a release that you wanted Mr. Jones to

3   sign in that regard?

4           MS. DECASTRO:  Yes, your Honor.  I sent him the

5   stipulation of confidentiality, and Mr. Jones sent me an

6   objection back to the stipulation and did not sign the

7   stipulation.

8           THE COURT:  OK.  Mr. Jones, what are you objecting to?

9   I think I understand the confidentiality stipulation to be so

10  that these materials could be used only in this case and not

11  shared with all of your friends.  What is your objection to the

12  stipulation that was sent, sir?

13          MR. JONES:  Well, my objection was is that it might

14  limit the scope of information that I might be otherwise --

15  otherwise to be -- to be -- to -- otherwise -- I'm sorry.

16          THE COURT:  Do you mean to say, sir, it might limit

17  the information you would otherwise be entitled to?

18          MR. JONES:  Exactly, yes.

19          THE COURT:  All right.  Let's do it this way, then.

20  Assuming you sign the confidentiality stipulation, Ms.

21  Decastro, I am going to ask you for the following:  If there is

22  CCRB reports regarding the officers listed in these

23  interrogatories or if there are disciplinary reports regarding

24  these officers, I would ask you, please, to produce them to me

25  in camera, and you may copy the enclosure letter to me -- to

Gasdjonc
                    Speakerphone Conference

1    Mr. Jones so that he knows that's what I'm doing.  I will look

2    at them and I will see if any of them -- or the degree to which

3    these materials, if any exist, should be produced to Mr. Jones.

4              Ms. Decastro, does that make sense?

5              MS. DECASTRO:  Yes, your Honor.  Just one quick note.

6    I had previously sent to you the CCRB reports.

7              THE COURT:  OK.

8              MS. DECASTRO:  You had made a decision on those, but I

9    can look for disciplinary reports to send those to your Honor

10   for review.

11             THE COURT:  That would be terrific.  Thank you for

12   reminding me.  I have done a couple of in-cameras lately.  You

13   will excuse me for forgetting yours was one of them.

14             MS. DECASTRO:  Yes.  That's OK.

15             THE COURT:  OK.  Thank you.

16             All right.  Interrogatory number 9.  Ms. Decastro,

17   have any of these individuals testified at a proceeding

18   involving Mr. Jones?

19             MS. DECASTRO:  I believe that they have testified at a

20   proceeding that was in the Grand Jury.

21             THE COURT:  OK.  Were any of these materials produced

22   as part of your earlier documentary productions to Mr. Jones?

23             MS. DECASTRO:  No, your Honor.  The Grand Jury

24   testimony is sealed.  We do not have a copy of that.  In order

25   to get a copy of that, we would have to get those records

Gasdjonc
                    Speakerphone Conference

1   unsealed my understanding is in state court and then they could

2   get unsealed.

3           THE COURT:  OK.  Mr. Jones, I don't reflexively order

4   Grand Jury disclosure.  So, sir, if you want those disclosed, I

5   am going to ask you, please, to make an application to me about

6   why they should be.  All right, sir?

7           MR. JONES:  OK.  Your Honor, if I may?

8           THE COURT:  You may.

9           MR. JONES:  The request -- the statement that I had

10  made therein was pertaining to a proceeding that had taken

11  place during my trial and I was acquitted.  If this was the

12  case that had nothing to do with the case at chief, the case

13  that is being argued now --

14          THE COURT:  OK.

15          MR. JONES:  -- the detectives had given testimony, and

16  I received part of the transcript from the complainant's

17  testimony and from the forensic pathologist, but I didn't get

18  the testimony regarding the detective and what he testified to.

19  And that was detective Joe Corillo, if I am pronouncing that

20  correct.

21          THE COURT:  Criollo.

22          MR. JONES:  Criollo, OK.

23          MS. DECASTRO:  Your Honor, if I may?

24          THE COURT:  Yes.  And, actually, that is going to make

25  me amend my prior discussion about Grand Jury testimony,

Gasdjonc
Speakerphone Conference

1    because I am reading this interrogatory more carefully and it

2    does not speak to Grand Jury testimony.

3            So, Ms. Decastro, yes, I will hear from you now.

4            MS. DECASTRO:  Yes, your Honor.  In the matter that

5    Mr. Jones is suing on now, the case that is before us, the

6    criminal case, that case was dismissed on 30.30 grounds, speedy

7    trial grounds.

8            THE COURT:  Yes.

9            MS. DECASTRO:  And there was no formal proceeding.

10   But that is the Grand Jury that they would have testified in.

11           I think Mr. Jones is saying that he had another

12   robbery case that he may have been acquitted O or convicted on,

13   I'm not exactly sure, and maybe he means that somebody

14   testified in that proceeding, but in this case my

15   understanding, there was no testimony except the Grand Jury

16   testimony.

17           THE COURT:  OK.  And, Mr. Jones, let me confirm your

18   understanding of that.  Is what you are asking for the

19   materials relating to another involvement that you had with the

20   New York criminal justice system?

21           MR. JONES:  Yes, it was a separate case.  The case

22   that involved after the initial case, which was the 2012 case,

23   there was a 2013 case where I had gone to trial and I was

24   acquitted.  I guess one of the detectives that was the lead

25   detective in the previous case had given testimony during that

Gasdjonc
                    Speakerphone Conference

1   trial proceedings, and he was -- he also gave testimony that

2   was transcribed, and those transcripts weren't made available

3   and I believe that they should have so that I could have at

4   least halfway been able to examine what he actually said during

5   the trial proceedings.

6           THE COURT:  All right.  But let me understand this,

7   sir.  Your complaint before me relates to the 2012 matter; is

8   that not correct?

9           MR. JONES:  That is correct, your Honor.

10          THE COURT:  OK.  And what you indicate is that there

11  were problems with the search warrant and therefore problems

12  with your arrest and therefore problems that led to the

13  deprivation of medical treatment.  Why does it matter for my

14  case what Officer Criollo testified to in an unrelated robbery

15  case?

16          MR. JONES:  Well, I was under the pretense that this

17  would help me to be able to establish some active role that he

18  played in the investigation, because this was two separate

19  cases but yet he participated in both cases as far as being the

20  lead detective and he was the only detective -- excuse me --

21  that gave testimony, so I was under the impression that that

22  might somehow give me some insight or some clarity as to this

23  particular detective and how he participated in my -- in the

24  development of my criminal case.

25          THE COURT:  All right.  It would be my expectation

Gasdjonc
Speakerphone Conference

1    that any testimony he gave in 2013 would not have related to

2    what happened in 2012.

3        Ms. Decastro, are you in a position to see what

4    statements were made by Officer -- or I don't know what

5    designation he holds -- of Criollo in the 2013 case regarding

6    the 2012 case?

7        MS. DECASTRO:  No.  Unfortunately, I am not.  In

8    order -- if plaintiff was acquitted, in order to even get those

9    transcripts we would have to get a new release for the release

10   of the minutes of that trial because they would be sealed under

11   160.51-160.55 and it would be very costly to order that

12   transcript.

13       If Creole, as Mr. Jones is saying, was involved, it is

14   probably because he is a robbery detective that works out of

15   Midtown North, so there could have been another robbery or

16   burglary I think that was picked on that he was also involved

17   in.  I do not have right now access to any of those

18   transcripts.

19       THE COURT:  OK.  Then I will not order it.  I am going

20   to move to interrogatory, let's see, number 10.

21       Ms. Decastro, was there DNA that was tested or

22   collected from the plaintiff?

23       MS. DECASTRO:  There was DNA that was collected from a

24   cup I believe that plaintiff used at the precinct, and

25   plaintiff has the DNA reports and everything from -- they were

                        Speakerphone Conference

1  included in the District Attorney's file that I turned over to

2  plaintiff.

3           THE COURT:  OK.  But I think what I'm understanding is

4  because it was from a cup from which he drank at the precinct,

5  there was no authorization to test that cup, is that correct?

6           MS. DECASTRO:  Yes.  That's my understanding.  I can

7  confirm with my clients but that is my understanding.

8           THE COURT:  All right.  He's asking for an

9  authorization.  I think you are telling me none exists?

10          MS. DECASTRO:  Yes, I don't believe that any exist.

11          THE COURT:  OK.  Obviously if you find in your travels

12  that one exists, you will produce it to him.

13          All right.  For number 11, Mr. Jones, I think I need

14  your assistance with this.  Are you saying that you believe

15  they entered your home because of the use of something that

16  gave them GPS tracking data?

17          MR. JONES:  Yes, your Honor, that's exactly what I'm

18  saying.  According to documents that I recently uncovered, that

19  they were required to get an order for eavesdropping and GPS

20  cell site warrant pertaining to that particular laptop, and

21  they were also required to get affidavits from the county

22  district attorney's office in order to execute that.  Because

23  it seems here that that particular procedure constitutes a

24  search, because there was no way that the officer could have

25  located the area precisely and that he, upon using this

1   hand-held device, was able to zero in on a particular signal.

2   Once he came closer to it, I guess the register would increase.

3   And then when he entered the home, unannounced -- and I wasn't

4   aware that he was there -- he walked up a flight of stairs

5   inside of the dwelling and he pointed the device at that

6   particular object and it gave a positive reading, and he didn't

7   question me, he didn't have any conversation with me, and then

8   he left.  And then when he returned -- the following day he had

9   filed for a warrant, a search warrant in order to execute the

10  search for that particular item that he had -- which had

11  registered on this handheld device.

12          THE COURT:  OK.  Mr. Jones, I am going to stop you for

13  a moment.  I know later on in your interrogatories you ask

14  questions about Triggerfish or other locating devices, so I

15  think all of these questions are of apiece, they are all

16  similar.  What I am understanding you to be saying is knowing

17  that there was a search warrant application, you would like to

18  see if there was any documentation for the GPS devices, like a

19  Triggerfish, that might have been used in establishing probable

20  cause for the search warrant; is that correct, sir?

21          MR. JONES:  That is correct, your Honor.

22          THE COURT:  OK.  Ms. Decastro, do you know from your

23  investigation what it is, if anything, that the officers used

24  prior to obtaining the search warrant?

25          MS. DECASTRO:  Your Honor, from my investigation, the

Gasdjonc
                    Speakerphone Conference

1    laptop that Mr. Jones alleges it was used to track him, that

2    laptop was stolen from somebody in a burglary and that person,

3    whoever -- I'm not going to speak to the complaining victim's

4    name, by that person would have given the officers

5    authorization to do something like a Find My Phone, Find My

6    Laptop, saying they are the person that would give the consent.

7    Officers don't need -- they don't need a warrant if they have

8    the consent of the complainant to track their property.

9            THE COURT:  I understand that.  Let me ask you a

10   couple of follow-up questions.

11           MS. DECASTRO:  Yes.

12           THE COURT:  When someone gives consent, are they

13   required to do it in writing?  Is there some sort of NYPD form

14   that must be filled out to find one's computer or find one's

15   phone?

16           MS. DECASTRO:  I'm not sure, your Honor.  I can look

17   into that.  But what I do know is that all of the documents

18   that are in this case, I've turned over the whole detective

19   file and the whole District Attorney file to Mr. Jones.  I

20   haven't seen that in there, but I can confirm whether it has to

21   be a written consent.  But I don't -- I don't believe that it

22   has to be, that it is a situation where it needs to be written

23   consent.  The complaining victim needs to report to the police

24   that the item is missing and that they would like it recovered,

25   but I can confirm.

Gasdjonc
Speakerphone Conference

1        THE COURT:  Please do, and thank you very much.

2        And as a result of -- and I'm understanding from your

3   answer to me earlier that I'm not going to find a Triggerfish

4   application because that wasn't what was used here.  What was

5   used was something based on the Find My Phone functionality of

6   the MacBook; is that correct.

7        MS. DECASTRO:  It was something like that, yes.  That

8   is my understanding.  I can confirm all of this and respond to

9   things relating to plaintiff's request, or one of the

10  interrogatory requests.

11       THE COURT:  All right.  And, I mean, the one we're

12  looking at is interrogatory 11, but I know it touches as well

13  on some of the other ones and you will see them as you go

14  through them.

15       With respect to interrogatory number 12, if there is a

16  disciplinary proceeding, you may produce the materials to me in

17  camera.

18       With respect to interrogatory 13 and 14 and 15, yes --

19  and, yes, 13, 14 and 15, what's being sought here are the

20  individual officers who were involved.  Ms. Decastro, is it

21  your position that the materials that you have produced in the

22  police file and the DA's office file contain that information

23  to the extent it is ascertainable?

24       MS. DECASTRO:  Yes, your Honor.  That information is

25  all in those documents.

Gasdjonc
                    Speakerphone Conference

1          THE COURT:  OK.  Let me look then at 16.

2          (Pause)

3          Mr. Jones, what is it that you are seeking in

4     interrogatory 16, please, sir?  Do you just want confirmation

5     that he sought and obtained a search warrant?

6          MR. JONES:  Well, I'm looking for confirmation that in

7     the initial contact that we were supposed to have had where he

8     sought some sort of authority to -- some sort of consent to

9     enter the home and after he -- under the pretense that he was

10    going to conduct an interview, which he failed to do, he took

11    the information that he obtained while in the home and he used

12    that information to help secure the search warrant by giving

13    the description of the location, which floor I occupied, what

14    was my living quarters status, which side of the room I had

15    slept on and those things, and that would have required a

16    search warrant for him to actually come and to do that.

17         THE COURT:  OK.  So, Mr. Jones, what you're saying is

18    you believe when the detective came by your home to interview

19    you, he was in fact using that as a pretext to get the

20    dimensions of your residence for a search warrant, correct?

21         MR. JONES:  That's correct, and he never actually

22    conducted an interview.  I never spoke with him.  I never -- I

23    didn't even know that he had come by that particular day

24    because, according to him, he walked up a flight of stairs and

25    he observed me in my private quarters, in my bedroom, and I

Speakerphone Conference

1   was, quote-unquote, using this alleged MacBook Pro, and he was

2   able to verify that it was in fact the item that he had -- that

3   he had -- Lieutenant Rivera had been seeking.

4         THE COURT:  OK.  Here, sir, I think what you are

5   asking is for the defendants to agree that they operated as a

6   pretext.  I think the better thing to do is the allegations or

7   the statements that Detective Hahn made are in his written

8   submissions.  You are permitted to argue, just as you have now

9   argued to me, that these were pretextual, and the defendants

10  will argue that they were an appropriate investigative

11  technique.  So there is no document to produce.  I think this

12  is just something where each of you will take different

13  positions on the legality of the conduct.

14        And I feel the same way about interrogatory 17, and

15  let me look at 18.  18 is duplicative of 1, so I'm not going to

16  ask for that more.  19 is duplicative of 2 and 3, so I'm not

17  going to ask for more on that.

18        Number 20 is a situation where, again, Mr. Jones, you

19  are asking for them to agree with your legal conclusion, and

20  that's not really proper for an interrogatory.  So you can make

21  the argument to me, sir, that this indictment was a consequence

22  or led to your 22 months of detention, but I'm not going to

23  have them agree or disagree that it was.

24        I will -- as to interrogatory number 21, that is a

25  legal proposition of the Fourth Amendment, which I will either

Gasdjonc
Speakerphone Conference

1    agree with, or not, at some later date, and you will take this

2    with the respect with which it is made.  I don't think care

3    whether the defendants share your view of the Fourth Amendment;

4    ultimately, I get to decide that.

5          Similarly interrogatory number 22.  Mr. Jones, let me

6    ask what you are seeking there?  Are you trying to see whether

7    there was an extant warrant for your arrest?

8          MR. JONES:  Yes, that and whether there were exigent

9    circumstances that required or that aided the officer in making

10   the decision to enter the home such as having some background

11   information that he could rely on that was accurate and that

12   gave him probable cause to believe that if he -- that if he

13   went to this particular location, that he would be able to find

14   the items that he had been looking for.

15         THE COURT:  I see.  It seems to me that he put all of

16   the facts that he thought were relevant in his submission, in

17   the complaint and in any search warrant application.  So I'm

18   not -- if he had other things he wanted to say, he should have

19   said those in the complaint or the search warrant

20   application --

21         MR. JONES:  Also, your Honor, if I may?

22         THE COURT:  Yes, sir.

23         MR. JONES:  Detective Robert Hahn is not a defendant

24   in this because I didn't place him in the caption as being a

25   defendant, and I only recently found out that he played such a

Speakerphone Conference

1  pivotal role in the development of this case.  But neither him

2  nor Robert Haynes or Victor Lopez or -- yes, those three, they

3  are not actually defendants because I wasn't aware that they

4  played such a pivotal role and I didn't classify them as being

5  such, so I don't know how that works as far as my being able to

6  extract information from them.

7  　　　　THE COURT:  OK.  Well, let me give you my thoughts on

8  that.

9  　　　　One does not need to be a defendant in the case to be

10  a party from whom you can seek discovery.  So even if they are

11  not defendants, if they have information that is relevant to

12  your case, I think you would still be permitted to obtain

13  discovery from them, and so that's not the problem.  The issue

14  is what is the discovery that you are seeking?

15  　　　　Again, they have given you in the files that were

16  produced to you in paper discovery the information that they

17  told the courts.  If it is your position that that information

18  is false, that's where you get to tell me.  They don't now get

19  to supplement or to put before me what they did not put in the

20  complaint or in the search warrant application.  So there is no

21  additional information for them to give you.  It's for you to

22  tell me whether the information that they gave to whether the

23  magistrate judge or the court who would endorse or issue the

24  arrest warrant or search warrant, whether that was enough and

25  whether it was accurate.  So you know what happened and you

Gasdjonc
Speakerphone Conference

1    know what they say happened, and you get to tell me whether

2    that was correct or not.  All right, sir?

3                 MR. JONES:  All right.  I understand, yes.

4                 THE COURT:  With respect to interrogatory 23, I'm not

5    going to invade privileged communications that might be present

6    here in terms of the CCRB responses.  I've already looked at

7    the CCRB files, which I remembered to be quite complete, and if

8    there are disciplinary history files, I will get those, too.

9                 With respect to interrogatory number 24, it seems to

10   me the City of New York can employ people who act as state

11   actors and who have the capacity to act under color of state

12   law.  So I am not going to have the defendants confirm that.

13                With respect to interrogatory 25, I think if there was

14   consent, it ought to have been in the files produced, and if it

15   is not there, then it doesn't exist.

16                For interrogatory 26, again, you're asking for the

17   defendants to give legal conclusions.  Those I get to give at

18   some point.

19                27 is the discussion we have had earlier about the

20   outline of the home for the warrant.  And there is a reference

21   there to a Felix Rivera, and he seems to be the person aligned

22   with it.

23                28, Ms. Decastro, were these -- was there an

24   interrogation and was it videotaped?

25                MS. DECASTRO:  My understanding is that there was no

Gasdjonc
                    Speakerphone Conference

1   interrogation.  If plaintiff remembers sitting for an

2   interrogation, I can go back and make sure, but my

3   understanding is that there was no interrogation.

4           THE COURT:  OK.  Mr. Jones, do you have a recollection

5   otherwise?

6           MR. JONES:  Yes, I do.  There was an interrogation,

7   your Honor, because it was during that interrogation where the

8   DNA was extracted from the cup, and I was still in -- and I was

9   still under custodial detention during that time.  So, yes,

10  there was.  And it was actually 16 hours and I recall that.

11  Because of that, some sort of ploy had been used to restrict

12  access to water, and I had a serious medical condition whereas

13  my kidneys were affected by the lack of or the want of water

14  and the use of toilets, so that I do recall.

15          MS. DECASTRO:  Your Honor --

16          THE COURT:  Yes, Ms. Decastro.

17          MS. DECASTRO:  -- given that he is saying that, I will

18  confirm and I will put it in writing whether there was or there

19  wasn't.

20          THE COURT:  Perfect.

21          MS. DECASTRO:  And whether there was any video.

22          THE COURT:  That is very useful.  Thank you very much.

23          For interrogatory 29, that goes back to our earlier

24  discussions about whether there is written authorization

25  regarding the MacBook, so I think that would be responsive.

Gasdjonc
                        Speakerphone Conference

1          Interrogatory 30 should be indicated in the file so I

2     won't have a separate interrogatory for it.

3          Interrogatory 31, there are questions about what one

4     does after execution of a warrant.  Ms. Decastro, I guess my

5     view is if there were forms that should have been completed,

6     such as inventory forms or things of that nature, they would be

7     in one of the two files that you produced; is that correct?

8          MS. DECASTRO:  Yes.  There are numerous property

9     vouchers and other NYPD vouchers that were produced.  They are

10    a part of the file that were disclosed to Mr. Jones.

11         THE COURT:  Let me ask a broader question.  Are there

12    any of these administrative paper -- you know, post-search

13    warrant or post-arrest warrant paperwork that would not be

14    produced or not be contained in these files?

15         MS. DECASTRO:  The only thing I can think of would be

16    the search warrant affidavit that usually also is not produced

17    to us by the District Attorney's office, it's sealed.  That

18    would be the only thing that I can think of.  But anything else

19    would be a part of the detective file that was sent to

20    Mr. Jones and a part of the District Attorney file that was

21    sent to Mr. Jones.

22         THE COURT:  OK.  Ms. Decastro, I'm not going to ask

23    you to go double-check everything that you have done so far.  I

24    am simply noting that Mr. Jones and I expect that if something

25    is not in those folders, it's not because it has been misfiled,

1   it is because it never existed.  Is that a fair assumption for

2   us to make?

3               MS. DECASTRO:  Yes, that is a fair assumption to make.

4               THE COURT:  OK.  And that is the assumption under

5   which we'll proceed.  If it is not there, it doesn't exist.

6               MS. DECASTRO:  Sorry, your Honor.  Just with the

7   exception of the search warrant affidavit and anything related

8   to the Grand Jury.

9               THE COURT:  Of course, and those are sealed matters,

10  yes.

11              MS. DECASTRO:  OK.  Sorry.  Just to clarify.

12              THE COURT:  No.  No.  No.  And it is an appropriate

13  clarification, and we all now share that same understanding.

14              With respect to 32, interrogatory 32 is more forms.

15  If they are not there, then they are not there.

16              Let me understand, Mr. Jones, your interrogatory

17  number 33, please.

18              MR. JONES:  OK.  After the search warrant, the officer

19  who applied for the search warrant was required to inform the

20  investigation liaison unit and identify himself and identify

21  the procedures that had taken place.  And there was a form,

22  referred to as a UF-49 Form, and it should have been prepared

23  in all cases and faxed to the -- to the Intelligence Division.

24  According to the paperwork that I had, no such approval,

25  because they had -- after 60 days they were still making their

Gasdjonc
Speakerphone Conference

1    requests and informing or sending those to the officer, the

2    detective, that this form has to be filled out anytime there is

3    a search warrant executed.  So I don't recall seeing that

4    particular document among those that were sent.

5        THE COURT:  OK.  Ms. Decastro, would you please look

6    into the existence of a UF-49 Form, and do you know what

7    Mr. Jones is speaking of with respect to that?

8        MS. DECASTRO:  No, I don't, your Honor.  I don't know

9    about -- this is the first time I'm hearing about somebody

10   having to notify the investigation liaison unit about

11   post-search warrant executions, but I now will confirm to make

12   sure that no such thing exists and I will provide information

13   to Mr. Jones and the Court about that.

14       THE COURT:  That's really -- that's all I am going to

15   ask you to do.  I thank you very much, because this is the

16   first time I'm hearing of it as well, but it may be that

17   Mr. Jones, you know, is teaching us both something about

18   something that should be either in these folders or readily

19   accessible.  So let's find out that because that is fair.

20           Interrogatory 34 speaks to the same form.

21           Let me look.  Interrogatory 35.  Now, let me

22   understand, is there -- I guess Mr. Jones is asking for a form,

23   if there is such a form, regarding the sealing of the files

24   post dismissal of the Indictment.  Does such a form exist?

25           MS. DECASTRO:  The only thing I can think of is the

Gasdjonc
Speakerphone Conference

1 certificate of disposition from the Criminal Court.  Sometimes

2 they are sealed, but besides that I don't believe any other

3 form exists --

4                THE COURT:  All right.

5                MS. DECASTRO:  -- in an instance like that.

6                THE COURT:  Would that have been included in the DA's

7 office file?

8                MS. DECASTRO:  It usually is.  I will verify.  If not,

9 we will ask for a certificate of disposition to produce to

10 Mr. Jones.

11                THE COURT:  Thank you very much.

12                All right.  With respect to 36, I guess it is the same

13 question.  Was this stuff -- this returned or destroyed?  I

14 don't know that there is an obligation.  I don't know that it

15 exists in the manner described in interrogatory 36.

16                Ms. Decastro, do you have some insight into that?

17                MS. DECASTRO:  My understanding is that the records

18 are not destroyed.  They are kept and they are kept and they

19 are not released to anyone unless there is an unsealing order

20 or unsealing release from the individual whose criminal matter

21 was sealed.

22                THE COURT:  OK.  All right.

23                MS. DECASTRO:  I don't believe that the records are

24 destroyed because I think we have a duty to preserve such

25 records, as the City of New York and as the state -- as the

Gasdjonc
                    Speakerphone Conference

1   Supreme Court of the State would have a duty to preserve those

2   records.

3           THE COURT:  All right.  We have the same obligations

4   on the federal side, so I am not going to ask for more on that.

5           It is my belief that interrogatory 37 is encompassed

6   by the DA's office file and/or the investigative file, as

7   possibly supplemented by anything, Ms. Decastro, you may find

8   in your questions after this conference.  So if you find

9   anything that's responsive to interrogatory 37, I am asking

10  you, please, to turn that over.

11          With respect to interrogatory 38, this is another

12  legal question.  The documents in the respective files that

13  have been produced to Mr. Jones indicate who spoke with him and

14  when and whether or not these constitute interviews or

15  questionings I think is something for me to determine at a

16  later date.

17          39 is a legal issue that we're not going to address in

18  this context.

19          40 is a question about the Find My Phone

20  authorization, which we've spoken about already.

21          41 is an inquiry into a Stingray or Triggerfish or

22  Hailstorm.  I'm now told -- and Ms. Decastro will let me know

23  if at any point I am wrong -- that what was used was something

24  akin to a Find My Computer/Find My Phone functionality in

25  Apple.

Gasdjonc
Speakerphone Conference

1    Interrogatory 42, Ms. Decastro, is there a written

2    directive or policy regarding medication or medical conditions

3    and how one deals with individuals who are being detained or

4    being questioned who may have medical issues?

5    MS. DECASTRO:  Yes, your Honor.

6    THE COURT:  Has that been produced?

7    MS. DECASTRO:  That has not been produced.

8    THE COURT:  Could you please produce it to Mr. Jones.

9    MS. DECASTRO:  Yes, your Honor.  The only thing I

10   would ask, if it can be produced subject to the protective

11   order once it is signed?

12   THE COURT:  That is very fair.  Mr. Jones, once you

13   sign the protective order, that will be produced.  All right,

14   sir?

15   MR. JONES:  Understood.

16   THE COURT:  Thank you.

17   All right.  Interrogatory 43 again speaks about the

18   MacBook Pro.  I think that is going to be resolved in other

19   ways.

20   The same with interrogatory 44.

21   Interrogatory 45, if those things, Stingray or

22   Hailstorm or Triggerfish were not used, then there is nothing

23   to produce.

24   The same for interrogatory 46.

25   So, those are the interrogatories.

Gasdjonc
Speakerphone Conference

1    Ms. Decastro, recognizing that I've just given you a

2    bunch of things to do, let me ask you for your best estimate of

3    a reasonable amount of time -- I'm emphasizing in my mind the

4    word "reasonable" -- how much time you need to get these

5    materials and produce them to Mr. Jones?

6    MS. DECASTRO:  Yes, your Honor.  I would ask for at

7    least 30 days.  I, unfortunately, have many cases that are in

8    the midst of discovery depositions in the coming days and next

9    month, and that would allow me some time to speak to my clients

10   again and speak to the NYPD and get all the relevant and

11   necessary documents, if any.

12   THE COURT:  OK.  Well, let me say this.  I am one of

13   those people who doesn't like extensions, so I am going to give

14   you until the 5th of December to produce whatever you need to

15   to Mr. Jones with the understanding that that will be all the

16   time I'm going to give you.  All right?

17   MS. DECASTRO:  Yes.  Thank you, your Honor.

18   THE COURT:  OK.  And thank you.

19   And then, Mr. Jones, you will have that material.

20   I think the next stage, then, is dispositive motion

21   practice, but are we in a position now to talk about that or do

22   we want to have -- I can set a schedule today for dispositive

23   motion practice.

24   Mr. Jones, you indicated to me that you wish to file a

25   summary judgment motion.  Do you still, sir?

Gasdjonc
                    Speakerphone Conference

1          MR. JONES:  Yes, your Honor.  In fact, I had been

2    preparing for that over the last few weeks.  The only dilemma

3    that I have is that the requirements that all interrogatories

4    and submissions be fully developed before summary judgment

5    could be actually executed.

6          THE COURT:  Of course.  So when you get these

7    materials from Ms. Decastro, you will be able to fill in

8    whatever gaps are in your current draft; is that correct, sir.

9          MR. JONES:  This is correct, your Honor.

10         THE COURT:  And, sir, could you tell me while we are

11   on this call what you contemplate your grounds for summary

12   judgment being?

13         MR. JONES:  The grounds for summary judgment would be

14   based on the unlawful entry by the detective on the 25th and

15   how everything else that followed that unlawful entry was fruit

16   of the poisonous tree and that I should have been entitled

17   to -- in the criminal prosecution I should have been entitled

18   to hearings so that the case could be fully adjudicated and

19   fully developed so that I would be able to have some record of

20   clarity as to what needed or what happened and/or what was

21   preserved for review by either a civil court or appellate

22   court.

23         THE COURT:  All right.  But, Mr. Jones, without doing

24   the research into the issues that you have just identified for

25   me, what I understand summary judgment to exist for is to exist

Speakerphone Conference

1   in the situation where the facts are not in material dispute --

2   there is no big dispute about the facts -- and they entitle you

3   to judgment as a matter of law.  You win because the facts are

4   in your favor and there is no real dispute about them.  Here,

5   however, even in our conversation I'm hearing a lot of disputes

6   about whether or not a person identified the MacBook Pro as

7   something that had been stolen, whether or not the officers

8   used that.  That to me sounds more like something that should

9   have to be addressed at trial.  Do you think that there are no

10  factual disputes that matter in this case, sir?

11          MR. JONES:  Well, there are factual disputes that may

12  matter, but I'm also under the impression that these things

13  could be resolved through the interrogatory stages or the

14  discovery disclosure and that by the time the case ripens for

15  the purpose of summary judgment, that all of these cases will

16  be -- all of the issues will be resolved and it will be

17  clean-cut and that there will be nothing left to litigate as to

18  the facts of the case.

19          THE COURT:  OK.  Sir, that may be the case.  I'm just

20  saying that based on everything I have heard in this

21  conversation, I think both sides might have a -- if you will

22  excuse the expression -- a tough row to hoe in trying to figure

23  out -- in trying to get summary judgment.

24          Ms. Decastro, is it your clients' position that they

25  also want summary judgment practice?

Gasdjonc
Speakerphone Conference

1    MS. DECASTRO:  Yes, your Honor.

2    THE COURT:  On everything or partial?

3    MS. DECASTRO:  The only thing I would think that would

4    maybe survive summary judgment would be a motion on the denial

5    of medical treatment claim that plaintiff has.

6    THE COURT:  That's what I'm thinking as well.  OK.

7    MS. DECASTRO:  Deliberate indifference to the medical

8    treatment, but everything else, it is our belief that there

9    aren't material issues of fact that would necessitate going to

10   trial on the false arrest and false prosecution and the

11   unlawful search and entry.

12   THE COURT:  OK.  Now, this is me as a human being and

13   not as a judge.  Is there any chance of this case settling

14   short of summary judgment practice or short of trial?

15   Ms. Decastro.

16   MS. DECASTRO:  Well, your Honor, I have not received a

17   demand from plaintiff.  If plaintiff wants to give me a demand,

18   I would bring it back to my client with -- you know, explaining

19   that there is this denial of medical treatment matter that may

20   proceed to a trial.  So it is a possibility.  I am not going to

21   say it is not a possibility without talking to my client.  So

22   if he were to give me a demand, I can explore that.

23   THE COURT:  Mr. Jones, if that's something you want to

24   do, don't do it now while I'm on the phone, but you can

25   communicate with Ms. Decastro and let her know what the demand

Gasdjonc
                    Speakerphone Conference

1   is.  All I'll say, sir, is like if your demand is in the

2   million-dollar range it's probably going to fail at the start.

3   But if you want at any point to have settlement negotiations

4   with Ms. Decastro and her clients, you know how to do that,

5   sir, correct?

6           MR. JONES:  That is correct, your Honor.

7           THE COURT:  OK.  Fine.

8           What I'll do, then, is I am going to put in the order

9   that I will issue today or Monday the December 5th date as the

10  date by which these remaining issues are to be resolved by the

11  defendants.  I will put in a briefing schedule.  I am very

12  likely to put in a briefing schedule that has summary judgment

13  practice that involves four briefs rather than six.  Basically,

14  you each want to make a motion, but rather than having you make

15  a motion at the same time as your adversary, I think what I'm

16  going to do is have Mr. Jones make his motion, have Ms.

17  Decastro respond to his motion and in the process make her

18  motion, and then have Mr. Jones get the last word on his motion

19  and Ms. Decastro have the last word on hers.  So it's four

20  briefs rather than six.  I'll set up in there the page limits

21  and the amount of time.

22          And, Ms. Decastro, you'll understand that because

23  Mr. Jones is *pro se*, I'd ask you, please, to give him copies of

24  any case cited in your briefing.

25          MS. DECASTRO:  Yes.  Of course, your Honor.

Gasdjonc
Speakerphone Conference

1          THE COURT:  Thank you so much.

2          All right.  So, Mr. Jones, do you understand what I

3     have just said about the scheduling that I would like to do?

4          MR. JONES:  Yes, your Honor, I do.

5          THE COURT:  OK.  Because I would rather have you write

6     two things than three.  Are you OK with that, sir?

7          MR. JONES:  Yes, that's quite fine.

8          THE COURT:  OK.  Great.  You will see that scheduling

9     order in the next couple of days.

10         Thank you both for participating in this call.  I

11    think it was very, very productive, and I thank you for being

12    both so well prepared for it.

13         Have a good weekend to both of you.  Thank you.

14         MS. DECASTRO:  Oh, your Honor, if I may just quickly?

15    I apologize.

16         THE COURT:  No, that is fine.

17         MS. DECASTRO:  The remaining issue that we have in

18    terms of discovery from plaintiff is we have had a very

19    difficult time getting plaintiff's medical records from Horizon

20    Health.  We've gotten dates that do not match even though

21    plaintiff gave us the right, appropriate date range, but the

22    problem is I believe he had a different booking case number

23    before the year 2015, and that may be what's holding up the

24    medical records.

25         THE COURT:  OK.

Gasdjonc
Speakerphone Conference

1    MS. DECASTRO:  Both Mr. Jones and I would like those

2    medical records and we have been waiting to do the

3    deposition -- we have discussed this in the past -- until after

4    I have received those medical records.

5    THE COURT:  You have told me that, that is correct.

6    MS. DECASTRO:  We are still waiting for those.  So

7    plaintiff has not yet been deposed, but I can try to see

8    Horizon Health -- or it is a new place now, but I will speak to

9    them to see what the situation is so we can get the deposition

10   in as soon as possible.

11   THE COURT:  OK.  Let me talk to both of you on this

12   issue.

13   Is it easier or is it possible that you can prepare a

14   form order for me to sign that Horizon would respond to?

15   MS. DECASTRO:  Yes, your Honor.  I was actually

16   thinking the same thing, because if we have plaintiff -- I will

17   send your Honor a so-ordered subpoena or a subpoena for the

18   Court's signature endorsement.

19   THE COURT:  OK.  Mr. Jones, do you understand that

20   what we are trying to do is to hasten the production of these

21   medical records?  Are you comfortable, are you authorizing me,

22   or at least not objecting, to my issuing an order to get those

23   records so that we can have your deposition?

24   MR. JONES:  No, your Honor.  That would be quite

25   helpful because I have been trying to get a copy of the records

Gasdjonc
Speakerphone Conference

1    as well and I seem to have failed miserably, so I will --

2              THE COURT:  I can promise you no better success, but

3    certainly I'll sign whatever appropriate order is presented to

4    me for those records.

5              MR. JONES:  OK.

6              THE COURT:  All right.

7              MS. DECASTRO:  OK.

8              THE COURT:  All right.  Ms. Decastro, thank you for

9    reminding me of that.

10             All right.  Anything else from either of you?

11             MR. JONES:  Just one question, your Honor.  The

12   application for pro bono, you told me that I may be able to

13   apply.  When is there going to be a deadline, if any, that

14   after that point there won't be an application made or an

15   application wouldn't be accepted by the Court?

16             THE COURT:  You can make the application at any time.

17   I will consider it.  The thing that you just have to know, sir,

18   is that there are many people who seek pro bono counsel and not

19   enough pro bono counsel for all of those people.  So I can

20   guarantee you nothing, sir.

21             MR. JONES:  Right.  Well, the previous pro bono issue

22   that we had -- that the Court had granted an attorney, Winston

23   & Strawn.

24             THE COURT:  Strawn, yes.

25             MR. JONES:  Right.  And they had litigated the issue,

Gasdjonc
Speakerphone Conference

1    the Federal Rule of Civil Procedure Rule 8 issue --

2              THE COURT:  Yes.

3              MR. JONES:  -- as to the pleading, and you had

4    inquired with them would they be willing to do any further pro

5    bono work.  And, you know, at that time they were unavailable,

6    and I believe that there has always been communication with

7    them.  Could that possibly be an avenue which could be

8    explored?

9              THE COURT:  I will speak with our pro bono coordinator

10   to speak with the particular attorney at Winston & Strawn with

11   whom you dealt, and if they are available, then I will let you

12   know.

13             MR. JONES:  OK, your Honor.

14             THE COURT:  All right.  Anything else, Mr. Jones?

15             MR. JONES:  No.  That's it.

16             THE COURT:  Thank you.

17             Ms. Decastro, anything else?

18             MS. DECASTRO:  That's it, your Honor.  Thank you, your

19   Honor.

20             THE COURT:  Again, thank you both.

21             MS. DECASTRO:  Have a good day.

22             THE COURT:  Bye-Bye.

23             MR. JONES:  Thank you.  Bye-bye.

24

25                            -  -  -