UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

ROBERT JONES,

                        Plaintiff,

                      v.

DETECTIVE JAMES MEEHAN, DETECTIVE
JOSE CRIOLLO, DETECTIVE ADAM
SAGER, DETECTIVE GREGORY
THORNTON, LIEUTENANT FELIX RIVERA,
and OFFICER STEVEN MIKOLANDA,

                     Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 16, 2018

14 Civ. 6402 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge[1]:

     Plaintiff Robert Jones, proceeding *pro se*, claims that his Fourth, Fifth,

Sixth, Eighth, and Fourteenth Amendment rights were violated in the course of

his January 2012 arrest and prosecution for a string of burglaries.  After the

Court dismissed *sua sponte* certain parties from the case, those remaining as

Defendants are the following present or former employees of the New York City

Police Department ("NYPD"): Detective James Meehan, Detective Jose Criollo,

Detective Adam Sager, Detective Gregory Thornton, Lieutenant Felix Rivera,

and Officer Steven Mikolanda (collectively, "Defendants").[2]  Pending before the

Court are the parties' cross-motions for summary judgment.  After a thorough

---

[1]    The Clerk of Court is directed to modify the caption of this case as set forth above.

[2]    The Complaint also names the Property Clerk's Office, presumably seeking to hold liable
a member of that office as a John Doe Defendant.  Because there is insufficient
evidence identifying, much less explaining the conduct of, any such defendant, the
Court will not address his or her liability further in this Opinion.

review of the record, and after construing Plaintiff's claims liberally because of

his *pro se* status, the Court concludes that Defendants are entitled to summary

judgment on all claims.

**BACKGROUND**[3]

**A.    Factual History**

As will soon become relevant to the Court's analysis, Plaintiff suffers

from a variety of medical ailments.  Plaintiff testified during his deposition that

as the result of a car accident in 1986 and an altercation with law enforcement

in 1999, he suffered injuries to his neck, back, right knee, and right hip; these

injuries have required at least two surgeries.  (*See* Pl. Dep. 20:6-21:24, 26:21-

27:9).  In addition, Plaintiff had been using crutches for around three years as

of December 26, 2011.  (Def. 56.1 ¶ 13).  Separately, Plaintiff suffers from high

blood pressure, for which he has been prescribed Simvastatin, Metoprolol, and

Enalapril Maleate.  (*See* Pl. Dep. 23:23-24:12).  And Plaintiff has been

diagnosed with several psychological conditions, including post-traumatic

---

[3]    The Court draws its facts principally from the Complaint ("Compl." (Dkt. #1)), and the parties' submissions in connection with the cross-motions for summary judgment, including Defendants' Local Rule 56.1 Statement ("Def. 56.1" (Dkt. #123)); Plaintiff's memorandum of law in support of his motion for summary judgment ("Pl. Br." (Dkt. #109) and reply memorandum ("Pl. Reply" (Dkt. #129)); the transcript of Plaintiff's deposition ("Pl. Dep." (Dkt. #122-8)); and the exhibits attached to the declaration of Maria Fernanda DeCastro ("DeCastro Decl., Ex. [ ]" (Dkt. #122)).  In addition, the Court will refer to Defendants' memorandum of law in support of their cross-motion for summary judgment as "Def. Br." (Dkt. #121)).  The Court's citations to Defendants' Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  As needed for clarity, the Court has cited to the page numbers assigned by this Court's electronic case filing system in referring to certain of Plaintiff's submissions. (Dkt. #109).  The Court will explain in greater detail, in the Discussion portion of this Opinion, the manner in which it construed the factual assertions in Plaintiff's submissions.

stress disorder, anxiety, and antisocial personality disorder. (*See id.* at 29:17-30:5).

During the relevant time period, Plaintiff was on parole and living in a halfway house. (*See* Def. 56.1 ¶¶ 64-68). The arrest underlying his current claims resulted from an investigation into a string of burglaries in a compact area of Manhattan. The NYPD's investigation into those burglaries, as well as Plaintiff's consequent arrest and prosecution, are discussed more fully below.

### 1. The Reported Burglaries

#### a. December 26, 2011 Burglary at 616 Ninth Avenue

On December 27, 2011, Detective James Meehan received a report that on the preceding day, the resident of an apartment located at 616 Ninth Avenue had returned to his apartment to find his front door open and personal items missing from the apartment. (Def. 56.1 ¶¶ 3-4). Those items included a 2005 Apple Macbook, a 2011 Apple Macbook, an Amazon Kindle, an iMac desktop computer, and $600.00 cash. (*See id.* at ¶ 5). The resident also reported that his kitchen window, which was normally closed, was open. (*Id.* at ¶ 6).

On December 29, 2011, Detective Meehan traveled to the scene to investigate the burglary. (Def. 56.1 ¶ 7). There, he found a knife that did not belong to the resident. (*Id.* at ¶ 8). Meehan also viewed a security video showing a black male with a crutch ascending the stairs to the floor of the resident's apartment, before descending the stairs and exiting the building "a short while later." (*Id.* at ¶¶ 11-12).

### b.    January 7, 2012 Burglary at 409 West 48th Street

On January 11, 2012, the resident of an apartment located at 409 West 48th Street informed Detective Jose Criollo that on January 7, 2012, her bedroom window had been opened and her two Apple computers had been stolen.  (Def. 56.1 ¶¶ 14-16).[4]

### c.    January 11, 2012 Burglary at 405 West 44th Street

Police also received reports of a burglary that occurred on January 11, 2012:  The resident of an apartment located at 405 West 44th Street informed Detective Criollo that at 6:30 p.m., "he heard a loud bang coming from his son's bedroom"; when he entered the room, he witnessed a black male standing in the middle of the room.  (Def. 56.1 ¶¶ 18-19).  The resident reported further that upon his entrance, the black male "fled through a window and went up the fire escape to the roof of the building."  (*Id.* at ¶ 20).  He described the culprit as a black male "with a goatee, approximately 20-30 years old, 5'10" tall, weighing approximately 180 pounds, wearing a black knitted cap."  (*Id.* at ¶ 21).

Later that day, at approximately 8:38 p.m., Detective Criollo reported to scene of the burglary and surveilled the area from the rooftop of 405 West 44th Street.  (Def. 56.1 ¶¶ 22-23).  From this vantage point, Detective Criollo noticed the window of an apartment in the adjacent building, 407 West 44th Street. (*Id.* at ¶ 24).  He then knocked on the door of the adjacent apartment and

---

[4]    Several of the electronics burglarized in this case could be identified by their serial numbers.  For security reasons, the Court does not repeat those numbers in this Opinion.

spoke with a witness who recalled that "he observed a black male with crutches go up to the roof of 405 West 44[th] Street" that same day.  (*Id.* at ¶¶ 25-27).

### d.   January 11, 2012 Burglary at 403 West 44th Street

Also on January 11, 2012, Police Officer Victor Lopez notified Detective Criollo about a potential burglary at a different adjacent building, 403 West 44th Street.  (Def. 56.1 ¶ 28).  According to Officer Lopez, while Criollo was responding to the 405 West 44th Street burglary, Lopez "noticed an open door and an open window at apartment 5B at 403 West 44th Street."  (*Id.* at ¶ 29). At approximately 8:59 p.m., Detective Criollo contacted and interviewed the resident of the apartment, who reported that upon entering the apartment, she noticed that several cabinets that were previously closed had been opened.  (*Id.* at ¶¶ 30-32).  She also gave Criollo a black knitted cap that she found on her bedroom floor near a window, which cap was then vouchered as evidence and submitted to the NYPD Lab for DNA analysis.  (*Id.* at ¶¶ 33-35).  The NYPD recovered DNA from the cap, which on April 3, 2012, returned a positive match with DNA of a prior offender, Plaintiff Robert Jones.  (*Id.* at ¶¶ 36-37; *see* DeCastro Decl., Ex. P).[5]

---

[5]     Defendants have introduced exhibits, including documents from the New York State Police Forensic Investigation Center, indicating that this state agency determined that the DNA obtained from "scrapings" of the discarded black cap matched a DNA sample of Plaintiff that was maintained in the New York State DNA Index System ("SDIS"). (DeCastro Decl., Ex. N-P).  In return, Plaintiff has submitted a report from the Office of the Chief Medical Examiner ("OCME"), comparing the DNA evidence from a cup from which Plaintiff drank at the Midtown North Precinct to other DNA evidence obtained during the investigation, including "hat scrapings," and finding that the source of the DNA on the cup was "most likely [the] major donor" of the DNA from the hat scrapings. (*See* Dkt. #109-1 at 5-8).

In the course of his investigation on January 11, Detective Criollo received several corroborating reports of a black male on crutches exiting 403 West 44th Street. Specifically, another officer reported that while Criollo was at 405 West 44th, the officer "observed a black male on crutches" exit 403 West 44th Street. (Def. 56.1 ¶ 38). Mayor's Office Investigator George Tsatsaronis also reported observing "a black male with a goatee, on what appeared to be one crutch, exit 403 West 44th Street." (*Id.* at ¶ 40).

### e. January 11, 2012 Burglary at 319 West 47th Street

Police also received reports of a third burglary in the area on January 11, 2012: The resident of an apartment at 319 West 47th Street reported that upon returning to his apartment, and in similar fashion to the other burglaries, he found a rear window open. (Def. 56.1 ¶¶ 41-42). He noted further that a Nikon camera, a Nikon camera lens, a JVC camcorder, and a camera bag had been stolen from the apartment. (*Id.* at ¶ 43).

### f. January 20, 2012 Burglaries at 407 West 50th Street

One week later, on January 20, 2012, the NYPD received three complaints from residents of apartments at 407 West 50th Street, reporting burglaries of their respective apartments on January 19, 2012. (Def. 56.1 ¶¶ 44, 48, 53; *see* DeCastro Decl., Ex. S, T). The first victim reported that he returned to the apartment to find a window over his fire escape open and that several personal items were missing, including a Mac Laptop. (Def. 56.1 ¶¶ 45-47). The second victim reported that she returned to her apartment to find her door chain-locked from within and the window above her fire escape

open.  (*Id.* at ¶¶ 49-50).  She initially reported that jewelry was missing from her apartment, and later reported that an Apple iPod was also missing.  (*Id.* at ¶¶ 51-52).  The third victim reported that he returned to his apartment to find a window open and a Mac Laptop missing.  (*Id.* at ¶¶ 54-55).

### g. January 24, 2012 Burglary at 947 Amsterdam Avenue

On January 24, 2012, the resident of an apartment at 947 Amsterdam Avenue reported to police that he returned to the apartment to find a candle on his living room windowsill knocked to the floor.  (Def. 56.1 ¶ 56).  He also reported that various items were missing from the apartment, including a Mac Laptop and iPad.  (*Id.* at ¶ 57).  The victim informed Detective Criollo that the "Find My [iP]hone" feature of his laptop had located his computer in the area of 581 Glenmore Avenue, in Brooklyn; this address was approximately 174 feet from 571 Glenmore Avenue, the address of a halfway house at which Plaintiff then resided.  (*See id.* at ¶¶ 58-60).

### 2. The Continued Investigation and Plaintiff's Arrest

### a. The Dissemination of the Police Sketch

On January 24, 2012, the NYPD created a sketch of the individual suspected of committing the January 11, 2012 burglaries, based on witness descriptions of the individual they observed exiting 403 West 44th Street.  (Def. 56.1 ¶ 61).  The sketch became a wanted poster that was distributed to various NYPD Precincts, and the following day, Lieutenant Seamus McHugh of the 77th Precinct, located in Brooklyn, informed Lieutenant Felix Rivera that a detective in his precinct had stopped an individual resembling the sketch.  (*Id.* at

¶¶ 62-63).  That individual was Plaintiff, who at the time was on parole and sharing a room with three roommates at the halfway house at 571 Glenmore Avenue.  (*Id.* at ¶¶ 64-68).

Armed with this information, on January 25, 2012, at approximately 10:45 p.m., Detective Gregory Thornton and Lieutenant Rivera, along with non-party Detective Robert Hahn, appeared at 571 Glenmore Avenue and received consent from the halfway house manager to enter the residence.  (Def. 56.1 ¶¶ 69-71).  The manager led Detectives Thornton and Hahn to Plaintiff's second-floor room, where Detective Hahn observed Plaintiff sitting on the bed "using one of the computers that was reported as stolen."  (*Id.* at ¶¶ 72-73).  Hahn also observed other electronics in the room and Plaintiff's crutches.  (*Id.* at ¶ 74).

### b.  Plaintiff's Questioning and Arrest

Plaintiff was then transported to the Midtown North Precinct for questioning.  (Def. 56.1 ¶ 75).[6]  Plaintiff contends that his questioning at the Midtown North Precinct lasted "16 hours and 15 minutes," during which the police deprived Plaintiff of blood pressure and psychiatric medication, water, and the use of a toilet.  (Pl. 56.1 ¶ 4; *see* Pl. Br. ¶¶ 25, 67, 86).[7]  He further

---

[6]     The record is unclear as to whether Plaintiff was placed immediately under arrest, or whether Plaintiff voluntarily accompanied the police to Midtown North.  (*Compare* DeCastro Decl., Ex. DD, at ¶ 11; Ex. EE, at ¶ 11 ("Plaintiff … agreed to go to the Midtown North Precinct for questioning."), *with* Pl. Dep. 154:4-11 (stating Detective Thornton "was one of the detectives that escorted [Plaintiff] out of the location … handcuffed and placed [Plaintiff] in the back of the police car")).

[7]     Plaintiff also asserts that he was arrested and taken to the Midtown North Precinct on January 27, 2012, rather than January 25, 2012.  (*See* Pl. 56.1 ¶¶ 1-3).  The record belies this timeline.  (*See, e.g.*, DeCastro Decl., Ex. DD, at ¶¶ 7-11; Ex. EE, at ¶¶ 2-11; Ex. FF, at ¶ 9).

maintains that Defendants sought to deprive Plaintiff of these necessities in order to force him to drink water from a white styrofoam cup, from which the officers then retrieved a sample of his DNA to compare with samples from unsolved burglaries, "which y[i]elded a neg[a]tive result." (Pl. 56.1 ¶ 6*; see* Pl. Br. ¶¶ 82-84). More importantly, Plaintiff contends that this deprivation caused him to develop Renal Insufficiency Syndrome, which was diagnosed during his stay at Rikers Island in July 2012. (*See* Pl. Br. ¶¶ 26, 28, 67).

On January 26, 2012, Plaintiff was placed in a lineup, and the resident of 403 West 44th Street who had encountered a burglar in his apartment identified Plaintiff as the burglar. (Def. 56.1 ¶ 76). On that same date, Detective Hahn acquired a search warrant for Plaintiff's room at 571 Glenmore Avenue; Detectives Thornton, Rivera, and Adam Sager executed the warrant at approximately 6:00 p.m. (*Id.* at ¶¶ 77-78). In Plaintiff's room, the detectives located the following stolen items, identified by serial number: the Mac laptop from the 409 West 48th Street burglary; two Mac laptops from the 407 West 50th Street burglary; the iPod from the 407 West 50th Street burglary; and the Mac laptop from the 947 Amsterdam Avenue burglary. (*Id.* at ¶¶ 79-83). All items but the first were located under Plaintiff's bed. (*See id.*).

While at the Midtown North Precinct from January 26 to January 27, 2012, Plaintiff was arrested and charged with nine burglaries. (*See* Def. 56.1 ¶ 84; *see also* DeCastro Decl., Ex. B). On January 27, 2012, Officer Steven Mikolanda transported Plaintiff to Bellevue Hospital for medical clearance because the police planned to voucher his crutches as evidence. (Def. 56.1

¶ 86). Medical records from Plaintiff's visit to Bellevue show that he related to medical personnel complaints of pain in his right knee and left hip, as well as Post-Traumatic Stress Disorder and anxiety. (*See* DeCastro Decl., Ex. KK). Plaintiff asserts that, "[a]fter the arrest, [he] didn't have access to high blood pressure medication until four days later when [he] was screened and processed in the Department of Corrections." (Pl. Dep. 111:6-18).

### c. Defendants' Allegedly Violative Conduct

The parties vigorously dispute the identities and conduct of the police personnel who interacted with Plaintiff during his time at the Midtown North Precinct. For his part, Plaintiff recalled that Detective Thornton transported him to the interrogation room "and refused to provide [Plaintiff] with water or medication or toilet" despite the latter's requests. (Pl. Dep. 154:8-9). He also claims that Detective Sager brought him to the precinct, conducted the lineup, and "was made aware that [Plaintiff] was in need of toileting" and had high blood pressure. (*Id.* at 154:13-21).

Plaintiff testified that while he was detained at Midtown North, Detective Meehan told Plaintiff that he would be questioned, at which point Plaintiff "said to [Meehan] that [Plaintiff was] off [his] medication," and that he "suffer[ed] from high blood pressure." (Pl. Dep. 62:7-22). Plaintiff contends that Meehan responded, "I'm going to question you," which prompted Plaintiff to refuse to answer questions and request a lawyer. (*Id.* at 62:16-25). Plaintiff contends further that after he was placed in the lineup, he returned to detention "for some time," during which "Detective Criollo stepped in and asked if [Plaintiff]

was alright," and in response to which Plaintiff, unsuccessfully, requested water and the use of a toilet. (*Id.* at 65:12-25). Plaintiff testified that Detective Meehan appeared again a short time later, at which point plaintiff requested the use of a toilet and his medication, to which Meehan responded, "I don't know about the medication." (*Id.* at 65:20-21). Finally, Plaintiff claims that while Officer Mikolanda transported Plaintiff to Bellevue Hospital, he denied Plaintiff medication and water. (*Id.* at 154:22-155:2).

Defendants proffer markedly different recollections of events. Detective Thornton admits to investigating Plaintiff's residence at 571 Glenmore Avenue before Plaintiff traveled to Midtown North for questioning, but claims he "never deprived" Plaintiff of water or the use of a bathroom "at any point in time during which [P]laintiff was at" the Precinct. (DeCastro Decl., Ex. EE, at ¶¶ 16-17). Detective Meehan goes even further, asserting that "[a]t no point during January 25, 2012, through January 27, 2012, did [he] have any interactions with [P]laintiff." (DeCastro Decl., Ex. D, at ¶ 14). Instead, Meehan states that his sole role in Plaintiff's case was gathering evidence related to the burglary reports and processing the arrest for one of the burglaries at the Midtown *South* Precinct. (*See id.* at ¶¶ 2-9, 13). And although Detective Criollo admits that he arrested Plaintiff at the Midtown North Precinct after one of the burglary victims identified Plaintiff in the lineup, Criollo states that he "never deprived [P]laintiff of water" nor the "use of a bathroom," and that "[P]laintiff

never asked [him] for any medication at any point in time during" his stay at Midtown North. (DeCastro Decl., Ex. J, at ¶¶ 23-27, 30-33).[8]

### 3. Plaintiff's Criminal Prosecution

On or about January 27, 2012, Detective Criollo filed a criminal complaint in the Criminal Court of the City of New York, New York County, charging Plaintiff with nine counts of Second Degree Burglary and eight counts of Fifth Degree Criminal Possession of Stolen Property. (*See* DeCastro Decl., Ex. LL). On or about February 1, 2012, a grand jury in the same court indicted Plaintiff. (Def. 56.1 ¶ 95). Over 21 months later, on November 14, 2013, the charges against Plaintiff were dismissed. (*Id.* at ¶ 96).

## B. Procedural History

Plaintiff, proceeding *pro se*, filed the Complaint in this action on August 4, 2014. (*See* Dkt. #1). On September 17, 2014, the Court dismissed certain defendants from the case because Plaintiff did not sufficiently allege their requisite personal involvement in the underlying events. (Dkt. #6). The Court also dismissed claims against the NYPD and the City of New York, as well as the prosecutors involved in Plaintiff's criminal case. (*Id.*).

On June 2, 2017, after the parties had completed discovery, Plaintiff moved for summary judgment. (Dkt. #109). On July 17, 2017, Defendants

---

[8]     Plaintiff did not testify specifically that Detective Rivera denied him medical treatment, but claimed instead that in his "supervisory capacity," Rivera "directed … Mikolanda to confiscate [Plaintiff's] crutches" and "was involved in all levels of the investigation." (Pl. Dep. 153:21-154:1). Rivera admits to having a supervisory role in the investigation, but similarly denies depriving Plaintiff of water or the use of a bathroom, and states that he "never recovered any medication from [Plaintiff" and "Plaintiff never asked [Rivera] for any medication at any point in time during which [P]laintiff was at the Midtown North Precinct." (DeCastro Decl., Ex. DD, at ¶¶ 19-22).

opposed Plaintiff's summary judgment motion and cross-moved for summary

judgment. (Dkt. #118-123). On October 13, 2017, Plaintiff replied to

Defendants' cross-motion (Dkt. #129), and on November 17, 2017, Defendants

filed a reply memorandum of law in support of their motion for summary

judgment (Dkt. #137).

## DISCUSSION

### A.    Applicable Law

#### 1.    Motions for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-23

(1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A

genuine dispute exists where "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am.*

*Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation

marks and citation omitted). A fact is "material" if it "might affect the outcome

of the suit under the governing law." *Anderson*, 477 U.S. at 248. "When ruling

on a summary judgment motion, the district court must construe the facts in

the light most favorable to the non-moving party and must resolve all

ambiguities and draw all reasonable inferences against the movant." *Dallas*

*Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citation

omitted). And where, as here, "parties file cross-motions for summary

judgment, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Fireman's Fund Ins. Co.*, 822 F.3d at 631 n.12 (alterations omitted) (quoting *Morales* v. *Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

## 2. Motions for Summary Judgment in *Pro Se* Cases

In a *pro se* case, the court must take an additional step and liberally construe the *pro se* party's pleadings "to raise the strongest arguments that they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

This task has been complicated by Plaintiff's imperfect compliance with Local Rule 56.1. Under that rule, a movant is required to identify admissible evidence in support of each factual assertion in his or her Rule 56.1 statement. *See* S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant … pursuant to Rule 56.1(a) … must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Conversely, a non-movant seeking to controvert these factual assertions must also cite to admissible evidence, and where properly-supported facts in a Rule 56.1 Statement are denied with only conclusory assertions, the court will find such facts to be true. *See id.*; *id.* at 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion

unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

"*Pro se* litigants are … not excused from meeting the requirements of Local Rule 56.1." *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing *Vt. Teddy Bear* v. *1-800-BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir. 2004)). Nevertheless, even where there is incomplete compliance with the Local Rules, a court retains discretion "to consider the substance of the plaintiff's arguments." *Id.* (citing *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted))); *see also Hayes* v. *Cty. of Sullivan*, 853 F. Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012) ("In light of Plaintiff's *pro se* status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record.").

Plaintiff's opening submission comprises a collection of assertions, both factual and legal, made under oath; a supporting memorandum of law; and various excerpts from transcripts of court conferences, pleadings, discovery responses of the parties, and documentary evidence. (Dkt. #109). His proffered Rule 56.1 Statement, however, is only two pages long and lacks any citations to admissible evidence in this case. Similarly, Plaintiff's combined reply brief and opposition to Defendants' cross-motion for summary judgment comprises largely conclusory retorts to Defendants' Rule 56.1 Statement, along

with a list of additional exhibits, not all of which were produced (and, thus, not all of which are available to the Court).[9]  Defendants urge the Court to deny Plaintiff's motion for summary judgment based on his failure to comply with Local Rule 56.1.  While the Court understands Defendants' frustration with Plaintiff's mode of arguing his claims, it also understands the difficulties Plaintiff experiences as a *pro se* litigant.  It therefore has overlooked his failure to comply with Local Rule 56.1, and has instead conducted a searching review of the record.

A word is in order, however, about what the Court has and has not considered among Plaintiff's submissions.  In addition to Plaintiff's affirmations, the Court has also construed the allegations of Plaintiff's Complaint to be assertions of fact made under oath, and has taken as true the well-pleaded allegations therein.  However, the Court has not taken as true any legal conclusions contained in Plaintiff's sworn statements, such as his assertions that certain conduct amounted to a violation of his constitutional rights, or that Defendants lacked probable cause to engage in certain conduct.  Additionally, the Court has rejected certain factual assertions that are wholly belied by the record in this case, including, for example, Plaintiff's statements about his arrest date.  Finally, the Court will not consider statements or

---

[9]  In places, Plaintiff suggests that a particular Defendant's failure to respond to his motion warrants entry of a default judgment as to that Defendant.  (*See, e.g.*, Pl. Reply ¶¶ 13-14).  This is incorrect, as Defendants jointly responded to Plaintiff's motion and jointly cross-moved for summary judgment in their favor.  (*See* Dkt. #118-123).

arguments that were more appropriately made in Plaintiff's now-dismissed criminal case.

### 3. Civil Rights Claims Under 42 U.S.C. § 1983

Plaintiff's mode of argument has also impacted the manner in which the Court and Defendants have construed his claims. (*See* Def. Br. 1 n.2 (detailing confusion concerning what claims Plaintiff was raising)). Plaintiff's Complaint, read liberally, initially suggested claims of warrantless searches and seizures, false arrest, and malicious prosecution, in violation of the Fourth Amendment (and, as to certain claims, the Fifth Amendment), as well as claims relating to his conditions of confinement, properly considered under the Fourteenth Amendment.[10] Plaintiff's opening brief, however, seeks summary judgment only as to his claim that Defendants were deliberately indifferent to his medical needs, in violation of the Fourteenth Amendment. What is unclear from Plaintiff's motion is whether he is moving for summary judgment on one of several claims of constitutional violations, thereby leaving the others for resolution at trial, or whether his Complaint should be construed to pursue only a single claim of deliberate indifference. The confusion was not clarified in Plaintiff's reply submission, which focuses on his deliberate indifference claim while offering brief rebuttals to Defendants' arguments for summary judgment on the other claims. The Court will assume that Plaintiff has raised claims for

---

[10] Plaintiff mistakenly argues that his conditions of confinement claims arise under the Eighth Amendment. *See Darnell* v. *Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims ... are governed by the Due Process Clause of the Fourteenth Amendment[.]").

false arrest, improper search and seizure, malicious prosecution, and deliberate indifference, and evaluate each of them under 42 U.S.C. § 1983.[11]

Section 1983 provides a remedy when a state actor deprives a plaintiff of federally protected rights, including rights provided by the Fourth and Fourteenth Amendments. *See* 42 U.S.C. § 1983; *see also City of Okla. City* v. *Tuttle*, 471 U.S. 808, 816 (1985) ("By its terms, of course, [§ 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere."). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt* v. *Cole*, 504 U.S. 158, 161 (1992).

"A § 1983 claim has two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges." *Annis* v. *Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *see also West* v. *Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc.* v. *Brooks*, 436 U.S. 149, 155-56 (1978)).

---

[11]    In the interest of completeness, Defendants have moved for summary judgment as to certain claims that might theoretically be discerned from Plaintiff's pleading, including claims for deprivation of property or equal protection violations under 42 U.S.C. § 1983, and for conspiracy to violate his civil rights under 42 U.S.C. § 1985.  To the extent that such claims were in fact made, the Court rejects them for substantially the reasons set forth in Points VII and VIII, and the second Point IX, of Defendants' memorandum of law in support of their motion.  Additionally, the Court does not understand Plaintiff to be raising state-law claims in his Complaint, and will not address any here.

### 4.    Qualified Immunity

Even were the Court to find that one or more Defendants violated Plaintiff's constitutional rights, liability under § 1983 might be foreclosed under the doctrine of qualified immunity.

"Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stephenson* v. *Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (internal quotation marks and citation omitted); *see generally Hassell* v. *Fischer*, — F.3d —, No. 16-2835(L), 2018 WL 265084, at *3 n.7 (2d Cir. Jan. 3, 2018); *Almighty Supreme Born Allah* v. *Milling*, 876 F.3d 48, 58-59 (2d Cir. 2017). Qualified immunity thus hinges on: "[i] whether plaintiff has shown facts making out a violation of a constitutional right; [ii] if so, whether that right was 'clearly established'; and [iii] even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez* v. *City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citing *Taravella* v. *Town of Wolcott*, 599 F.3d 129, 133-34 (2d Cir. 2010)).

For a constitutional right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987); *see also Ashcroft* v. *al-Kidd*, 563 U.S. 731, 741 (2011). "In other words, existing precedent must have placed the statutory or constitutional

question beyond debate." *Reichle* v. *Howards*, 566 U.S. 658, 664 (2012) (internal citation and quotation marks omitted).

"Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon* v. *Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citing *Creighton*, 483 U.S. at 641). "The objective reasonableness test is met — and the defendant is entitled to immunity — if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Id.* (citing *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)). Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt* v. *Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks and citation omitted).

**B.      Defendants Are Entitled to Summary Judgment on All Claims**

**1.      Plaintiff's Fourth and Fifth Amendment Claims Fail**

The Court discerns several Fourth Amendment claims in Plaintiff's Complaint, including allegations that one or more Defendants (i) improperly entered Plaintiff's residence to arrest him on January 25, 2012; (ii) improperly searched his residence on January 26, 2012; (iii) improperly obtained a sample of Plaintiff's DNA from a drinking cup he used at the Midtown North Precinct; and (iv) participated in the malicious prosecution of the Plaintiff. (*See, e.g.*,

Compl. ¶ 51 (alleging Defendants "deprive[d] [P]laintiff of [h]is constitutionally protected interest guaranteed under the Fourth Amendment … to be free from illegal search and seizure, without probable cause to arrest"); *see also, e.g., id.* (complaint headings throughout beginning with "Malicious Prosecution"), ¶¶ 14-20, 51, 54-56, 93-97, 127-31). For the reasons set forth in the remainder of this section, the claims all fail.

### a. January 25, 2012 Entrance into Plaintiff's Residence

Although "[t]he Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects," it does not prohibit such entry where police officers obtain "voluntary consent … either from the individual whose property is searched or from a third party who possesses common authority over the premises." *Illinois* v. *Rodriguez*, 497 U.S. 177, 181 (1990) (internal citations omitted). "[T]he exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." *Georgia* v. *Randolph*, 547 U.S. 103, 109 (2006).

Further, although the authority necessary to consent to a police officer's residential entry might not extend to a landlord or hotel manager, *see Georgia* v. *Randolph*, 547 U.S. at 112, a parolee living in a halfway house, such as Plaintiff here, has a diminished expectation of privacy and thus a lessened Fourth Amendment protection than an average tenant or hotel guest, *see Samson* v. *California*, 547 U.S. 843, 850 (2006) ("[P]arolees have fewer

expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment."); *cf. United States* v. *Amerson*, 483 F.3d 73, 84 (2d Cir. 2007) ("Probationers … have diminished — but far from extinguished — reasonable expectations of privacy.").

Here, the manager of Plaintiff's halfway house consented to Detectives Thornton and Hahn, and Lieutenant Rivera, entering the halfway house and guided them to Plaintiff's shared bedroom on the second floor of the building. Thus, although the officers did not have a warrant to enter the residence, given Plaintiff's lessened expectation of privacy as a parolee, the halfway house manager's consent validated their entrance into the halfway house. *Cf. United States* v. *Reyes*, 283 F.3d 446, 457 (2d Cir. 2002) ("It is beyond doubt that [probationer]'s actual expectation of privacy in the environs of his home was necessarily and significantly diminished because [he] was … serving a court-imposed term of federal supervised release that mandated home visits 'at any time' from his federal probation officer.").

More fundamentally, the record establishes that Detective Hahn gathered the inculpatory evidence against Plaintiff by viewing Plaintiff through an open door sitting on his bed with a reportedly stolen computer alongside other stolen electronics and his crutches. (*See* DeCastro Decl., Ex. EE, at ¶ 9 ("Detective Hahn and [Detective Thornton] encountered [P]laintiff … at the halfway house" and "observed [him] through an open bedroom door[.]")). *Cf. United States* v. *Delva*, 858 F.3d 135, 149 (2d Cir. 2017) ("Under the plain-view exception, 'if police are lawfully in a position from which they view an object, if its

22

incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." (quoting *Minnesota* v. *Dickerson*, 508 U.S. 366, 375 (1993))). Hahn was subsequently the affiant for the search warrant of Plaintiff's residence; he was not, however, named as a defendant in this case. The record does not establish that any of the Defendants conducted a warrantless search of Plaintiff's room on the evening of January 25, 2012, and "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid* v. *Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (quoting *Farrell* v. *Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). Accordingly, the record does not establish a constitutional violation stemming from Defendants' entrance into the halfway house and their observations of Plaintiff on January 25, 2012.

### b. January 25, 2012 Transport to Midtown North Precinct

As noted, the record is unclear as to whether the officers formally arrested Plaintiff on January 25, 2012, or whether he consented to travel to the Midtown North Precinct for further questioning. *See supra* note 6. Assuming for purposes of analysis that Plaintiff was arrested without a warrant immediately before or after his transportation to the Midtown North Precinct, there was abundant probable cause for the arrest and no Fourth Amendment violation.

A law enforcement officer may effect a warrantless arrest given probable cause to believe, at the moment of the arrest, that the individual subject to

arrest has committed a crime.  *See Devenpeck* v. *Alford*, 543 U.S. 146, 152 (2004); *United States* v. *Llanes*, 398 F.2d 880, 883 (2d Cir. 1968).  An officer has probable cause if such belief is founded upon "facts and circumstances within" the officer's "knowledge and of which they had reasonably trustworthy information." *Llanes*, 398 F.2d at 883.  In the context of an arrest for burglary, courts have found probable cause based on factors such as a *modus operandi* linking the crimes to the defendant, descriptions of the suspect matching the defendant's characteristics, and the defendant's possession of property stolen during the offense.  *See, e.g.*, *Wiltshire* v. *Wanderman*, No. 13 Civ. 9169 (CS), 2015 WL 4164808, at *3 (S.D.N.Y. July 10, 2015); *Williams* v. *Carter*, No. 7:13 Civ. 382 (DNH), 2014 WL 5361494, at *5 (N.D.N.Y. Oct. 21, 2014).

Here, assuming *arguendo* that Plaintiff's transportation to the Midtown North Precinct occurred pursuant to an arrest, Defendants would have had probable cause for same.  At that time, they were aware of a string of burglaries committed in a tightly-circumscribed geographic area by a suspect described as a black male who used a crutch.  In addition to the videos corroborating this description, Defendants were aware that another officer had identified Plaintiff as resembling a sketch of the suspect, and that one of the stolen computers had indicated that it was located near Plaintiff's address.  And any suspicions the officers may have had at the time they entered the halfway house were confirmed when Detective Hahn observed Plaintiff sitting on his bed, using a laptop, surrounded by electronics far too numerous to be for his personal use

and accompanied by his crutches.  Detective Thornton and Lieutenant Rivera did not falsely arrest Plaintiff.

### c.    Retrieval of the DNA Sample

Plaintiff spends a substantial portion of his motion papers outlining various constitutional violations that are alleged to have occurred when Defendants Criollo and Meehan caused Plaintiff to drink from a cup at the Midtown North Precinct house and, thereby, leave a DNA sample that could be compared to DNA recovered from the cap and the knife.  (*See* Pl. Br.; Pl. Reply; *see also* Pl. Dep. 153:1-7 (identifying Criollo and Meehan)).  The circumstances under which that DNA was allegedly obtained are discussed later in this Opinion in the Fourteenth Amendment analysis.  Here, the Court focuses on whether these Defendants violated the Fourth Amendment in obtaining the DNA sample.  It concludes that they did not.

"The Fourth Amendment does not protect abandoned or voluntarily discarded property because any expectation of privacy that may have existed becomes irrelevant the moment it is abandoned."  Anip Patel, *The Constitutionality of DNA Sampling of Arrestees*, 13 U. PITT. J. TECH. L. POL'Y 1, 25 (2012).  Both the Supreme Court and the Second Circuit are clear on this point.  *See, e.g.*, *United States* v. *Lee*, 916 F.2d 814, 818 (2d Cir. 1990) ("When a person voluntarily abandons property, ... he forfeits any reasonable expectation of privacy that he might have had in the property."); *United States* v. *Levasseur*, 816 F.2d 37, 44 (2d Cir. 1987) ("[A] warrantless search or seizure of abandoned property does not violate the fourth amendment." (citing *Abel* v.

25

*United States*, 362 U.S. 217, 240-41 (1960) ("There can be nothing unlawful in the government's appropriation of ... abandoned property.")).  Even if Plaintiff could claim a reasonable expectation of privacy in a drinking cup that was provided to him by law enforcement during his interrogation — a proposition the Court highly doubts — any such expectation dissipated when he discarded the cup after the questioning.[12]  There was, therefore, no Fourth Amendment violation in recovering the cup and obtaining the DNA sample.[13]

---

[12]  Relatedly, the Supreme Court has upheld state statutes that permit the warrantless obtaining of DNA samples from individuals arrested for serious offenses.  *See Maryland* v. *King*, 569 U.S. 435, 465-66 (2013) (upholding provision of Maryland DNA Collection Act; "When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.").  And while the New York DNA collection and indexing statute, N.Y. Exec. Law § 995, does not address, and thus does not authorize, law enforcement officers to obtain DNA samples from arrestees, the language of *King* suggests that this practice, as applied to the particular facts of this case, would not violate the Fourth Amendment.

In his submissions, Plaintiff suggests that Defendants have violated 42 U.S.C. § 14135e, a provision of an earlier version of the federal DNA collection statute.  (*See* Pl. Br., Dkt. #109 at 11).  Those provisions have been transferred to 34 U.S.C. ch. 407, and include provisions for, among other things, the collection and analysis of DNA from certain offenders, training in and improvements to DNA technology and research, and grants to states to implement DNA collection processes for arrestees.  The analogue to the provision cited by Plaintiff is 34 U.S.C. § 40706, which criminalizes the use of DNA samples obtained pursuant to this chapter for purposes other than those specified in this chapter.  Because this federal statute was not implicated by the events at issue, § 40706 is inapplicable to the DNA sample from the cup.

[13]  To the extent that Plaintiff is raising a Fifth Amendment challenge to this conduct, it also fails.  In *Schmerber* v. *California*, 384 U.S. 757, 764, 761 (1966), the Supreme Court clarified that the Fifth Amendment privilege against self-incrimination does not protect a person from being compelled to produce "real or physical evidence," but rather protects against the compulsion of evidence that is "testimonial or communicative [in] nature."  Here, because the DNA sample taken from the cup is neither testimonial nor communicative in nature, Plaintiff's Fifth Amendment rights were not violated. *See id.* at 765 (concluding that blood sample was admissible because it "was neither petitioner's testimony nor evidence relating to some communicative act or writing" by petitioner); *accord Toliver* v. *Artus*, No. 11 Civ. 1051 (MAT), 2013 WL 55692, at *9 (W.D.N.Y. Jan. 3, 2013).

### d.    January 26, 2012 Search of the Residence

The Court next considers the search that Detectives Thornton, Rivera, and Sager conducted on January 26, 2012, pursuant to the warrant they obtained on the basis of Detective Hahn's affidavit.  Fourth Amendment precedent confirms that police may enter a home to execute a valid search warrant, so long as they operate within the scope of the warrant.  *See Steagald* v. *United States*, 451 U.S. 204, 211-12 (1981) ("[W]e have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant."); *Rogers* v. *Cartagena*, No. 10 Civ. 9285 (JPO), 2013 WL 1285169, at *4 (S.D.N.Y. Mar. 28, 2013) ("No search conducted pursuant to a valid search warrant violates [the Fourth Amendment], so long as the officers conducting the search do so within the warrant's scope.").  To be valid, a warrant must (i) "be issued by [a] neutral, disinterested magistrate[]"; (ii) be supported by "probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense"; and (iii) "particularly describe the things to be seized" and "place to be searched."  *Dalia* v. *United States*, 441 U.S. 238, 255 (1979) (internal quotation marks and citations omitted).

Here, the record provides no indication that the court issuing the warrant operated as a "rubber stamp for the police."  *United States* v. *Ventresca*, 380 U.S. 102, 109 (1965).  Moreover, Detective Hahn's affidavit, submitted in support of the warrant application, provided ample probable cause for the warrant's issuance.  That affidavit stated that during his

investigation, Hahn discovered that the suspect of several burglaries between November 30, 2011, and January 19, 2012, was often "described as a black male who was using crutches" and that "some of the above incidents, specifically the entry or exit from [the] buildings, were captured on surveillance video." (DeCastro Decl., Ex. FF, at ¶ 7). The affidavit also stated that an Apple laptop taken from one of the residences contained a tracking device that indicated that the laptop was located "on Glenmore Avenue near Schenck Avenue[,] which is less than one block from the target premises." (*Id.* at ¶ 8). Hahn stated that upon visiting the target premises, he observed Plaintiff on the "lower left bunk" in a bedroom, "using an Apple laptop which had previously been taken from one of the … residential locations," that Plaintiff "was using crutches," and that Hahn "observed other laptops and electronics involved in the commission of said crimes." (*Id.* at ¶ 9). Finally, the warrant particularly described the things to be seized — "evidence of proceeds from a string of burglaries" including electronics, currency, and evidence of ownership — and the place to be searched, including "the common area" of 571 Glenmore Avenue, "and the upstairs front bedroom, specifically the lower left bunk bed … , the area under said bed, the area next to … said bed, the dresser located on the left of the room, the closet in said room, and the area directly adjacent to the closet[.]" (DeCastro Decl., Ex. GG).

Plaintiff has failed to identify any deficiencies in the warrant used to search his room, and the Court has found none. Accordingly, Detectives

Thornton, Rivera, and Sager did not violate the Fourth Amendment in executing the warrant the day after Plaintiff's arrest.

### e. Malicious Prosecution

Throughout his Complaint, Plaintiff uses the term "malicious prosecution" to connote conduct by Defendants that Plaintiff believes violated his constitutional rights. The Court has considered, however, whether Plaintiff has in fact demonstrated a claim for malicious prosecution, and finds that he has not.

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his [constitutional] rights ... , and must establish the elements of a malicious prosecution claim under state law." *Manganiello* v. *City of N.Y.*, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal citations omitted); *See also Rohman* v. *N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000). A malicious prosecution claim under New York law, in turn, requires a plaintiff to prove "[i] the initiation or continuation of a criminal proceeding against plaintiff; [ii] termination of the proceeding in plaintiff's favor; [iii] lack of probable cause for commencing the proceeding; and [iv] actual malice as a motivation for defendant's actions." *Manganiello*, 612 F.3d at 161.

For all of the reasons discussed in this Opinion, Plaintiff has not raised a genuine dispute of material fact concerning any of his alleged constitutional violations. Likewise, however, Plaintiff has failed to raise a triable dispute concerning the elements of malicious prosecution under state law. *First*, the

record does not establish that Defendants initiated a criminal proceeding against Plaintiff. Police officers, such as the named Defendants here, "do not generally 'commence or continue' criminal proceedings," but a malicious prosecution claim "can still be maintained against a police officer if the officer is found to 'play an active role in the prosecution'" such as by "generat[ing] witness statements or ... regularly [remaining] in touch with the prosecutor regarding the case." *Bermudez* v. *City of N.Y.*, 790 F.3d 368, 377 (2d Cir. 2015) (alterations and citations omitted).

Put somewhat differently, "[b]ecause there is a presumption that prosecutors exercise independent judgment in deciding whether to pursue a prosecution, plaintiff must demonstrate that defendant 'distorted the process by which plaintiff was brought to trial.'" *Bazemore* v. *City of N.Y.*, No. 12 Civ. 5088 (KBF), 2016 WL 1449746, at *5 (S.D.N.Y. Apr. 12, 2016) (quoting *Bailey* v. *City of N.Y.*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015)) (citing *Townes* v. *City of N.Y.*, 176 F.3d 138, 147 (2d Cir. 1999)). No such evidence has been presented in this case. Although Detective Criollo signed the criminal complaint against Plaintiff charging him with burglary (*see* DeCastro Decl., Ex. LL), the record is bereft of facts concerning any Defendant's further involvement in Plaintiff's prosecution, much less any improper conduct that could sustain a claim of malicious prosecution.

*Second*, Plaintiff's malicious prosecution claim fails for much the same reasons that Plaintiff's Fourth Amendment claim fails: As in the Fourth Amendment context, probable cause is a complete defense to malicious

prosecution.  *Harper* v. *City of N.Y.*, No. 11 Civ. 4333 (CM), 2013 WL 432599, at *3 (S.D.N.Y. Jan. 31, 2013); *see generally Stansbury* v. *Wertman*, 721 F.3d 84, 95 (2d Cir. 2013) (observing that "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases" (citing *Boyd* v. *City of N.Y.*, 336 F.3d 72, 76 (2d Cir. 2003)).  "One need not be certain of the outcome of a criminal proceeding to have probable cause for instituting such action.  Rather, '[p]robable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty.'"  *Cox* v. *Cty. of Suffolk*, 827 F. Supp. 935, 938 (E.D.N.Y. 1993) (quoting *Colon* v. *City of N.Y.*, 60 N.Y.2d 78, 82 (1983)).

"[U]nder New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"  *Dufort* v. *City of N.Y.*, 874 F.3d 338, 352 (2d Cir. 2017) (internal citations omitted).  That burden lies squarely on Plaintiff, and he has not discharged it.  Plaintiff presents no new facts that would have invalidated his prosecution, and as discussed above, the probable cause supporting his arrest was plentiful.  Indeed, the positive identification by a victim during a lineup alone would have sufficed to establish probable cause.  *See Keith* v. *City of N.Y.*, 641 F. App'x 63, 67 (2d Cir. 2016) (summary order) (finding probable cause where victim positively identified suspect after seeing him in neighborhood and again during lineup, and noting, "information from

an identified citizen accusing another individual of the commission of a specific crime is [generally still] sufficient to provide the police with probable cause" (quoting *Okunubi* v. *City of N.Y.*, 971 N.Y.S.2d 338, 340 (2d Dep't 2013))); *Smith* v. *City of N.Y.*, 388 F. Supp. 2d 179, 187 (S.D.N.Y. 2005) (finding probable cause where investigator relied on victim's description of defendant and other officer's descriptions of alleged crime).

*Third*, the record contains simply no evidence that Defendants acted with actual malice. In the malicious prosecution context, the element of actual malice requires proof "that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Cox*, 827 F. Supp. at 940 (quoting *Nardelli* v. *Stamberg*, 44 N.Y.2d 500, 503 (1978)); *accord Smith*, 388 F. Supp. 2d at 187. Given the surfeit of evidence against Plaintiff that, even now, he fails to refute — including witness identification, discovery of stolen goods in his room, and electronic indications from at least one stolen item that it was in the vicinity of his residence — Plaintiff cannot plausibly argue that Defendants acted with the requisite malice in pursuing his prosecution.

There is no viable malicious prosecution claim on these facts. More to the point, Plaintiff has failed to identify a genuine dispute of material fact as to any of his Fourth or Fifth Amendment claims. Summary judgment is therefore warranted in favor of Defendants on these claims.

## 2. Plaintiff's Fourteenth Amendment Claim Fails

Plaintiff's allegations concerning his interview at Midtown North can also fairly be read to allege a claim under the Fourteenth Amendment: Plaintiff contends that during his detention there, Defendants were deliberately indifferent to Plaintiff's medical conditions, which indifference resulted in his later diagnosis of Renal Insufficiency Syndrome. (*See, e.g.*, Pl. Br. ¶¶ 25, 41-45). Although the Court is keenly aware of the importance of medical treatment for those in police custody, it finds that Plaintiff has not identified a genuine dispute of material fact in this regard, and that Defendants are entitled to summary judgment.

Before analyzing Plaintiff's claim, the Court pauses to define and contextualize it. Plaintiff argues that Defendants deliberately deprived him of water, medication, or toileting opportunities at the precinct house, in order to trick him into providing a DNA sample when he drank from the cup that was eventually provided to him. Such trickery, even if true, does not a due process violation make. *See Okin* v. *Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) ("To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." (internal quotation marks and citation omitted)); *cf. Illinois* v. *Perkins*, 496 U.S. 292, 297 (1990) ("*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust" in law enforcement). What is more, Plaintiff's argument collapses of its own illogic: If Defendants were so

singularly focused on obtaining a DNA sample from Plaintiff, they would have been only too eager to offer him a beverage (for obvious reasons) or his medication (which would have required Plaintiff to drink something), and there would have been no reason for Defendants to be antagonistic to Plaintiff's bathroom breaks. However, the Court will put these obvious logical fallacies to the side, and will construe Plaintiff's arguments with all the strength that the record permits.

### a. Applicable Law

Courts in the Second Circuit analyze a pretrial detainee's claims of unconstitutional conditions of confinement, such as inadequate medical care, under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Punishment Clause. *Darnell* v. *Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Nevertheless, "[a] detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (quoting *City of Revere* v. *Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). A claim for inadequate medical care requires a showing of "deliberate indifference to ... serious medical needs," which in turn requires proof of two elements: "medical need" and "deliberate indifference." *Smith* v. *Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).

The first element, "medical need," is objective, measuring "the severity of the alleged deprivation." *Smith*, 316 F.3d at 183-84. Courts assessing this prong "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause" the plaintiff. *Salahuddin*

v. *Goord*, 467 F.3d 263, 280 (2d Cir. 2006). Factors informing this analysis include "[i] whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' [ii] whether the medical condition significantly affects daily activities, and [iii] 'the existence of chronic and substantial pain.'" *Brock* v. *Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (quoting *Chance* v. *Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). In addition, "the actual medical consequences that flow from the alleged denial of care will be highly relevant[.]" *Smith*, 316 F.3d at 187.

The Second Circuit has recently clarified that the second element, "deliberate indifference," though often characterized as "subjective," is better understood as an element simply analyzing *mens rea* because it is "defined objectively." *Darnell*, 849 F.3d at 29, 35. Indeed, this element requires proof that the defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant[] knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. This standard therefore does not encompass "an inadvertent failure to provide adequate medical care." *Estelle* v. *Gamble*, 429 U.S. 97, 105-06 (1976).

### b. Discussion

Even viewing the facts in Plaintiff's favor, the Court cannot say that Defendants were deliberately indifferent to Plaintiff's medical needs. Neither Plaintiff's blood pressure nor his psychological conditions were sufficiently

serious to mandate immediate medical attention by Defendants on pain of constitutional violation. And even if they were so serious, Defendants neither intentionally nor recklessly failed to tend to Plaintiff's medical conditions.

*First*, considering the severity of the alleged deprivation in the context of the surrounding circumstances, neither Plaintiff's blood pressure nor his psychological conditions were sufficiently serious to require the officers at Midtown North to render immediate medical care to Plaintiff. Courts have come to differing conclusions as to whether high blood pressure is a serious medical condition, *see Lozada* v. *City of N.Y.*, No. 12 Civ. 38 (ILG) (JMA), 2013 WL 3934998, at *6 (E.D.N.Y. July 29, 2013) (comparing cases); but the record here does not suggest that Plaintiff's condition posed any potential for immediate harm if he went without blood pressure medication while at Midtown North.

Tellingly, Plaintiff's own actions make plain that *he* was not terribly concerned — and thus that Defendants were justified in not being concerned — about his blood pressure during that period. Plaintiff had elected not to take his blood pressure medication since the morning of the day before his arrest. (*See* Pl. Dep. 62:7-15). And, despite Plaintiff's recollection that he informed medical professionals at Bellevue of his blood pressure condition (*see* Pl. Dep. 79:20-22), the medical records make clear that the only medical issues Plaintiff reported were injuries to his right knee, left hip, and lower lumbar spine, and diagnoses of post-traumatic stress disorder and anxiety. (*See* DeCastro Decl., Ex. KK). Similarly, when discussing prescriptions with

Bellevue personnel, Plaintiff only reported taking Vicodin and Prozac; a member of the psychiatric department who noted his Post-Traumatic Stress Disorder thus prescribed him a dose of Klonopin before his discharge. (*See id.*). In short, there can be no dispute that Plaintiff informed anyone at Bellevue of a serious blood pressure condition or an urgent need for medication. *Cf. Davis* v. *Klein*, No. 11 Civ. 4868 (ENV), 2013 WL 5780475, at *4 (E.D.N.Y. Oct. 25, 2013) ("[N]o reasonable jury could credit plaintiff's account" of his injuries from an arrest "where undisputed medical records *directly and irrefutably* contradict[ed] plaintiff's description[.]" (citing *Bove* v. *City of N.Y.*, 98 Civ. 8800 (HB), 1999 WL 595620 at *6 (S.D.N.Y. 1999)).

And with respect to Plaintiff's mental health issues, the Court does not doubt that Plaintiff suffers from such conditions. But the record does not show that Plaintiff presented symptoms or complaints of such conditions to a degree that presented the potential for further harm or debility. *See Bellotto* v. *Cty. of Orange*, 248 F. App'x 232, 237 (2d Cir. 2007) (summary order) (finding that county jail was not deliberately indifferent to inmate's medical needs where "the only medical consequence he alleges was an anxiety attack, which … resulted in no physical injuries and 'no acute distress'"); *cf. Covington* v. *Westchester Cty. Dep't of Corr.,* No. 06 Civ. 5369 (WHP), 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010) ("[C]ourts [have found] that depression *with suicidal ideation or severe anxiety attacks* are sufficiently severe conditions to meet the objective element of the deliberate indifference standard." (emphasis added)); *Zimmerman* v. *Burge*, No. 9:06 Civ. 0176 (GLS) (GHL), 2009 WL 3111429, at *8

(N.D.N.Y. Sept. 24, 2009) (collecting cases for the proposition that psychological conditions may be sufficiently serious if numerous or coupled with suicidal ideation or severe anxiety).  In short, the record does not establish that Plaintiff's blood pressure or psychological conditions were sufficiently acute to raise a genuine dispute of fact on the "medical need" prong of the deliberate indifference analysis.

And even if Plaintiff's conditions were sufficiently serious, the record is clear that Defendants did not intentionally or recklessly place Plaintiff in a position of "excessive risk to health or safety."  *Darnell*, 849 F.3d at 35. Plaintiff testified that he did not receive his blood pressure medication until four days after his arrest "when [he] was screened and processed in the Department of Corrections."  (Pl. Dep. 111:15-18).  Because, even crediting Plaintiff's recitation of events, Defendants interacted with Plaintiff only for a matter of hours, no jury could find that Defendants caused or contributed to the worsening of Plaintiff's condition or his developing Renal Insufficiency Syndrome.  *Cf. Bilal* v. *White*, 494 F. App'x 143, 145-46 (2d Cir. 2012) (summary order) ("Although epilepsy and arthritis arguably are serious underlying conditions, the record … demonstrates a temporary delay or interruption in the provision of otherwise adequate medical treatment for those ailments lasting only a few hours.  Even assuming that [Plaintiff]'s conditions could produce serious complications if neglected over sufficient time, there is no evidence that [Plaintiff]'s conditions worsened over the hours of delay here." (internal citations omitted)).  Indeed, given Plaintiff's decision to not take his

blood pressure medication for more than a day prior to his arrest, the delay in receiving blood pressure medication can be laid largely at his feet. *See Buffaloe v. Fein*, No. 12 Civ. 9469 (GBD) (AJP), 2014 WL 1224446, at *3 (S.D.N.Y. Mar. 20, 2014) (holding plaintiff did not prove deliberate indifference as to heart and back conditions where he "contributed to his own condition by refusing meals"); *Ross v. Kelly*, 784 F. Supp. 35, 46-47 (W.D.N.Y.) (holding that plaintiff did not prove deliberate indifference where plaintiff was "largely to blame for many of the delays in treatment"), *aff'd*, 970 F.2d 896 (2d Cir. 1992).

Plaintiff claims that the delay in receiving his blood pressure medication and water caused the Renal Insufficiency Syndrome with which he was diagnosed in Rikers Island six months later. However, he has proffered no medical evidence from which a trier of fact could discern a causal connection; to the contrary, the medical records from Rikers disclose that Plaintiff suffered from both chronic kidney disease and chronic Hepatitis C, both of which were more likely causes of his Renal Insufficiency Syndrome and neither of which could have been caused by a half-day deprivation of medication. (*See, e.g.*, Pl. Br., Dkt. #109-3 at 31). And with respect to Plaintiff's psychological conditions, the record is clear that Plaintiff received medication at Bellevue after reporting his diagnoses, thanks in large measure to Defendants' efforts in transferring him to the hospital for medical clearance. (*See* DeCastro Decl., Ex. KK).

In short, while the Court is mindful — and law enforcement should be equally mindful — of the need for officers to ensure that arrestees and

detainees remain in compliance with their medical and mental health treatment regimens, no reasonable jury could find on these facts that any of the Defendants was deliberately indifferent to any of Plaintiff's medical or psychological needs. Summary judgement is warranted, therefore, as to Plaintiff's Fourteenth Amendment claims.

### 3. Defendants Are Entitled to Qualified Immunity

The Court has scrutinized the record and has found insufficient evidence to raise a triable question of fact concerning constitutional violations visited upon Plaintiff in connection with his arrest and prosecution for the burglary charges. However, even had the Court found any such violation, it would have found Defendants subject to qualified immunity. As detailed earlier in this Opinion, the Court's inquiries in this regard focus on whether Plaintiff has proffered evidence of the violation of a right that was "clearly established," and, if so, whether it was "objectively reasonable" for the Defendant in question to believe the conduct at issue was lawful. *Gonzalez*, 728 F.3d at 154.

The Court acknowledges that the Fourth, Fifth, and Fourteenth Amendments are well-known to law enforcement officers such as Defendants. But whether the precise contours of these rights, as identified by Plaintiff in his submissions, were clearly established may be a different issue. Assuming that point, the Court nonetheless finds that it was objectively reasonable for Defendants to believe that the following actions were lawful:

(i) Requesting consent to enter a halfway house from the manager of that halfway house, in order to question a then-current parolee living there;

(ii)     Observing, from an open door to a shared bedroom, Plaintiff using and possessing an inordinate number of electronics similar to electronics that had been reported to have been burglarized by an individual who had an appearance and crutches similar to those of Plaintiff;

(iii)    Arresting Plaintiff after observing the electronics, the crutches, and the proximity of Plaintiff's residence to the signal received from the "Find my [iP]hone" functionality, and after compiling witness statements and reports from other law enforcement officers that suggested Plaintiff's involvement in the offenses;

(iv)    Obtaining a DNA sample from a white styrofoam cup discarded by Plaintiff; and

(v)     Obtaining a search warrant from a neutral magistrate based on the abundant evidence suggesting Plaintiff's involvement in the burglaries.

On this record, there can be no serious quarrel with Defendants' entitlement to qualified immunity. For this independent reason, summary judgment in favor of Defendants on all claims is warranted.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED, Defendants' cross-motion for summary judgment is GRANTED, and Plaintiff's causes of actions are DISMISSED WITH PREJUDICE.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      January 16, 2018
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge

*Sent by First Class Mail to:*
Robert Jones
BRC Center/Homeless Services
146 Clay Street
Brooklyn, NY 11222